CONTINENTAL CONCRETE PIPE CORPORATION, Indiv. and in the Name of the Village of Bridgeview, Plaintiff-Appellant, v. CENTURY ROAD BUILDERS, INC., *et al.*, Defendants-Appellees.

First District (6th Division)   Nos. 1—88—2771, 1—88—2787, 1—89—0007 cons.

Opinion filed March 2, 1990.

2

Querrey & Harrow, Ltd., and Chapman & Cutler, both of Chicago (Ellyn B. Dorf, Victor J. Piekarski, Lawrence R. Smith, and David T.B. Audley, of counsel), for appellant.

Steinberg, Burtker & Grossman, Ltd., of Chicago (Richard J. Grossman and Jeffrey M. Brown, of counsel), for appellees.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Continental Concrete Pipe Corporation (Continental), brought an action for an accounting to recover the purchase price for concrete pipe sold to the defendant, Century Road Builders, Inc. (Century). Century counterclaimed against Continental for breach of expressed and implied warranties and sought to recover damages for supplying allegedly defective pipe.

After a bench trial, the judge entered judgment for Continental but awarded only a portion of its contract price. He also entered judgment for Century on its counterclaim. Continental appeals from both judgments.

The Village of Bridgeview (Village) hired Robinson Engineering (Robinson), the Village engineers, to design a sewer project to divert sanitary flow into the Metropolitan Sanitary District facility.

Century was the only bidder on the job. Century had approximately 20 years' experience in laying storm sewers, water mains, sanitary sewers and in road work, paving, mass excavation and restoration work in underground utilities primarily in the south suburbs of Chicago. Century had an excellent working relationship with Robinson, with whom it had worked on approximately 10 to 15 other projects. The project called for the use of 15-inch, O ring, sanitary sewer pipe. The specifications required the pipe and joint assemblies to meet American Society for Testing and Materials (ASTM) standards. Century had installed several O ring pipe projects before.

On August 26, 1982, Century and Continental signed a subcontract for Continental to sell 2,466 feet of pipe along with gaskets and lubricant. Continental had supplied Century with concrete pipe on almost all its concrete pipe projects. Specifically, George Kachavos, Century's president and sole stockholder, discussed the cost of the pipe and its expected performance with Continental's salesman, Thomas Locke. Locke had sold concrete pipe with an O ring gasket for use on other sanitary sewer projects, and he knew that the specified pipe would be used in a sewer project.

Kachavos was concerned with the infiltration requirement because experience indicated that that "particular material" had the most difficulty in achieving the required infiltration. Locke assured him that the pipe would comply with ASTM standards, that it would have tight joints and that Continental would conduct a vacuum test on each pipe to insure that the pipe barrel would not leak. Locke testified that Continental did, in fact, conduct a vacuum test on every piece of pipe that was sold to Century. The total contract price was $17,084.25. The pipe consisted of a barrel, a bell and a spigot. A bell was on one end of the pipe and a spigot on the other. An O ring rubber gasket was to be inserted in a groove on the spigot end of the pipe. A lubricant was to be applied to the joint before assembly.

Century began installing the sewer line on September 27, 1982. Continental delivered the pipe an average of 288 feet at a time, and it made nine deliveries to Century between September 27 and November 5, 1982. The crew would use a backhoe to push the spigot end of one pipe into the bell end of another pipe which had already been bedded on the ground. The O ring gasket was placed on the spigot and greased for insertion into the bell. As soon as a section of pipe was laid and a joint sealed, the pipe was backfilled with stone and dirt.

During the installation of the first 100 feet of pipe on the first day the crew noticed a "backout" problem. After joining several pipes, one of Century's employees became concerned when the spigot end of a newly laid pipe rolled back out of the bell end of an already laid pipe approximately 1 to 1½ inches. Kachavos immediately contacted Continental's salesman, Tom Locke. Locke arrived at the jobsite and demonstrated how to properly lubricate and install the O ring gaskets. He insisted that Continental had supplied the correct gaskets for the pipes utilized in the project. The backout problem eased a bit, but occurred throughout the remainder of the project.

Century's crew followed the instructions of Kachavos to deal with the occasional, but continuing, backout problem. The crew held the pipe in with a bar and dumped two buckets of stone and dirt on top of the barrel of the pipe to keep it from rolling back out. The crew was careful to keep the dirt away from the bell or spigot ends so that no dirt came in contact with the O ring. The weight of the stone and dirt would hold the pipe "home" and keep it from backing out. The crew used this technique on about 5 or 6 of the 40 or 50 joints which they laid each day.

Locke stopped at the jobsite about twice a week to check on the job and to see whether the crew needed supplies. He indicated that he was satisfied with Century's gasket installation and with the installation in general.

George Robinson, a field inspector with Robinson, visited the jobsite at various times each day to insure that the pipes were being installed according to its specifications. He kept a daily log. He believed that Century performed its job properly and that it was installing the pipe correctly. The crew maintained a straight and true line throughout the job. He never saw evidence of either improper bedding or backout.

Russ Prekwas, Robinson's project engineer, also visited the jobsite about twice a week, and Wally Wroble of the Metropolitan Sanitary District checked on the job three or four times a week.

On November 16, 1982, after the first phase of the project had been completed and 1,800 feet of pipe had been laid, George Van Deursen, the Century foreman, conducted an infiltration test which was required by the Metropolitan Sanitary District. The test revealed an excessive amount of infiltration, and the line failed the test. This was the first time that Kachavos became aware of any infiltration problem.

Kachavos ordered Van Deursen to inspect the line to determine the precise cause of the leaks. Kachavos also contracted with Video

Pipe Grouting, Inc., to televise the pipe and to grout the leaks. Kachavos became aware of cracks in the pipe joints during the telegrouting process.

On December 9, 1982, Kachavos phoned Locke and requested a meeting at the jobsite. He informed Locke that he was concerned about the infiltration problem in the sewer line and that telegrouting had revealed cracks in the joints of the pipe. On December 30 Kachavos and Van Deursen informed Locke that they suspected the extensive cracking was due to defective pipes. Locke denied that there was any problem with the pipe.

Kachavos then contracted with Jo Mar Telegrouting (Jo Mar) to video tape the entire line to observe cracks, leaks and alignment. Apparently, Continental concurred in the decision. Jo Mar televised the sewer line in January and twice in February 1983.

In early January 1983, Locke attributed the problem with the sewer line to "ground conditions and some working conditions out there." In a telephone conversation on January 4, Kachavos threatened Continental with "severe consequences" if it did not participate in remedying the situation.

After observing the consistency of the cracks in the joints of the pipe, Kachavos retained Wiss, Janney, Elstner Associates (Wiss) as consulting engineers in February 1983. Kachavos instructed Wiss to do whatever was necessary to discover what was causing the joints to crack. Wiss appointed John Stecich, a structural engineer, as project manager for the assignment.

In very late February or early March, Kachavos met with Locke and another representative of Continental to discuss what arrangements could be made to cover the cost of the damages resulting from the cracked pipes. Locke again denied that the pipe was defective and indicated that Continental was not responsible. The representative of Continental demanded payment for the pipe and warned that he would file a mechanic's lien for the price of the pipe. On March 10, 1983, Kachavos wrote a letter to Continental demanding that Continental pay damages due to the pipe's failure. He also enclosed a copy of Stecich's initial report which indicated that the joints were defective for a relatively large number of pipes.

On March 16, 1983, Continental filed its notice of lien. In a letter dated April 8, 1983, Continental demanded payment for the pipe.

Because Jo Mar was not available in February 1983, Kachavos contracted with A. Metz, Sewers, Inc. (Metz), to do videotaping, grouting and pressure testing of each pipe joint. Metz worked on the sewer line from March 23 to May 4. After viewing the final attempt

by Metz to telegrout the line, Kachavos asserted that everything he had seen in the Jo Mar tapes was also seen in the Metz tapes. Moreover, each tape showed additional cracking. Each crack appeared in the shoulder line of the spigot. On April 25, 1983, the line failed a second infiltration test.

Kachavos proposed to replace the sewer line with a new one at a meeting with Prekwas, the project manager of Robinson. Robinson approved the line's replacement with the provision that Century would pay for additional charges connected with the time and cost involved in staking-out and observing the installation of a second line.

The cost of the replacement pipe was approximately 11% higher than the cost of Continental's pipe. Century began constructing the second line on May 13, 1983; Robinson formally approved the line on May 16, 1983; the Metropolitan Sanitary District finally accepted the line on August 15, 1983.

Century installed approximately 1,800 feet of the 2,466 feet of pipe delivered by Continental. A "significant" number of cracked pipes remained stored in Century's yard or buried in the ground as part of the backfill. Century used approximately 400 feet of Continental's pipe in installing the second sewer line.

On May 18, 1983, Continental filed a three-count complaint for an accounting and other relief against Century seeking to recover $17,084.25 plus interest and costs, as the purchase price of the pipes and related materials ordered by Century.

Century filed an answer and an affirmative defense. It essentially alleged that Continental had sold it defective pipes and had breached its warranties of merchantability and fitness for a particular purpose. Continental denied the allegations of the affirmative defense.

On February 10, 1984, Century filed its counterclaim against Continental and sought to recover in excess of $275,000 for breach of express and implied warranties.

On August 11, 1984, Continental answered Century's counterclaim denying its allegations; it separately filed an affirmative defense asserting that any conditions, damages, repairs or injuries suffered by Century were a direct and proximate result of Century's misuse and improper installation of the pipe. It later amended its affirmative defense to include an assertion that Century had breached its duty to mitigate damages.

After a bench trial, the judge entered judgment for Continental on its complaint but awarded damages for only $2,754. That amount represented the cost of the 400 feet of pipe which had been used by Century in the second line it installed. The judge also entered judg-

ment for Century on its counterclaim and awarded the sum of $277,514.86. Although he granted Century an award of 15% for overhead, he denied any award for profit or prejudgment interest.

Continental first contends that the trial judge erred when he barred two experts from testifying on behalf of Continental. The judge held that the plaintiff had violated Supreme Court Rule 220. (107 Ill. 2d R. 220(b).) A resolution of this issue requires an examination of the chronology of the pleadings, the discovery motions, answers to interrogatories and the judge's order.

Century filed its counterclaim on February 10, 1984. On April 9, 1984, upon Continental's motion, the judge entered an order compelling the parties to respond to all outstanding discovery by June 26, 1984. On May 10, 1984, Century related that representatives of Wiss would appear as its experts.

On July 6, 1984, Century served interrogatories and a request to produce on Continental. The interrogatories and request to produce specifically sought, among other things, the identity of expert witnesses, including employees.

On September 20, 1984, Continental filed its answers to Century's interrogatories which, among other things, identified F.M. Deeb of Press-Seal Gasket Corporation (Press-Seal) as a person who had knowledge of the facts of the occurrence and subsequent damage.

On October 18, 1984, the judge ordered Continental to comply with Century's outstanding request to produce by November 19, 1984. On November 28, 1984, Continental filed its response to Century's request to produce but did not identify any experts.

On January 16, 1985, the judge ordered that all discovery be completed by May 1, 1985. On April 15, 1985, upon Continental's motion, the judge extended discovery to June 26, 1985. Following a pretrial conference on November 9, 1985, the judge ordered disclosure of all expert witnesses within 45 days.

On January 2, 1986, Century requested Continental to identify its experts. Finally, after Continental failed to disclose its experts within the 45 days ordered on November 9, 1985, and after it failed to answer the supplemental interrogatories of January 2, 1986, Century moved for sanctions, which included an order to bar expert testimony on behalf of Continental.

On April 29, 1986, the judge entered an order barring expert testimony on the part of Metz, which had also filed a claim against Century; the judge ordered Continental to comply with discovery by May 15, 1986, and to produce its expert witnesses for deposition by May 29. On May 15, Continental filed an answer naming Milton Sees,

whom it had allegedly previously identified, and Robert Molzahn as its experts. At that time Continental informed the court that Molzahn would "testify with respect to whether the pipe in question and the gaskets in question were appropriate for the job"; he would also testify with "respect to improper installation being a cause of the problems with the sewer line." The answer also alleged that no tests or experiments had been conducted by Molzahn or any other expert. There is nothing in the record to show what Continental represented to be the future testimony of Sees.

On June 3, 1986, upon Century's motion, the judge ordered Continental to produce its second expert, Milton Sees, for his deposition on July 2.

On March 12, 1987, Continental informed Century by letter that it had provided a report made on December 9, 1983, by Stecich, Century's expert, to Press-Seal. The letter, in part, is as follows:

"Although we have not formally retained Press-Seal in any expert capacity, in terms of paying them a fee for services rendered, I expect that someone from Press-Seal will testify in behalf of Continental Concrete at the time of trial. The subject of their testimony will be the compression of a pressed seal gasket and the calculations which Mr. Stecich made to arrive at a forty-eight percent to fifty-one percent compression factor. Since I don't have the calculations from the deposition as yet, I cannot tell you what their specific opinion will be other than to say that they quarrel greatly with the statements regarding compression continued within the Stecich 12/9/83 correspondence."

On April 6, 1987, Continental informed Century that the individuals from Press-Seal were Fred Deeb and Jim Skinner.

On May 13, Century filed a motion to bar Deeb and Skinner as expert witnesses on the ground that Continental had violated the court's orders and Supreme Court Rule 220. Continental filed a response to the motion, and the judge entered an order barring Deeb, Skinner and any other employee of Press-Seal from testifying on behalf of Continental.

The decision to impose Rule 220 sanctions rests with the discretion of the trial court and will not be overturned absent a clear showing of abuse. (*Castro v. South Chicago Community Hospital* (1988), 166 Ill. App. 3d 479, 519 N.E.2d 1069.) In determining whether a trial court has abused its discretion, fairness to the trial court as well as to the parties demands that a reviewing court consider the record that was before the trial court and not what has been

added in the reviewing court. It is the responsibility of the appellant to present a sufficiently complete record of the proceedings in the trial court to support a claim of error and, in the absence of such a record, it will be presumed that the trial court acted in conformity with the law and that it had a sufficient factual basis for its rulings. (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 459 N.E.2d 958.) No transcript of the hearing on the motion to bar the witnesses has been provided. Consequently, we are unable to determine what arguments were advanced by Continental.

We make this observation because Continental now makes arguments, which will be discussed later, and which do not appear to have been made in the trial court. For example, Continental now argues that the court's ruling barred Deeb from testifying as an occurrence witness. There is nothing in the record to indicate that Continental ever informed the judge that it wished to call Deeb in any capacity other than as an expert. The pleadings were restricted to the question of whether he could be called as an expert, and the order itself does not expressly bar Deeb from testifying as an occurrence witness. Moreover, it is clear to us that Deeb could not and would not have been called as an occurrence witness.

■■ It has been held that the absence of a transcript of a hearing can prevent a reviewing court from holding that a trial court abused its discretion. (*Libco Corp. v. Roland* (1981), 99 Ill. App. 3d 1140, 426 N.E.2d 309.) We are not prepared to go so far in this case as to hold that the absence of the transcript is fatal to Continental's position. But we do hold that we will consider only matters of record that we do know were before the trial judge. Therefore, insofar as this appeal is concerned, the only matters of record before the trial judge before he entered the order are Century's motion to bar and Continental's response, various discovery motions, the judge's previous orders and answers to interrogatories.

Abbreviated, Continental's argument centers on an alleged difference between two reports submitted by Stecich, Century's expert. Stecich submitted his first report on March 1, 1983. Continental received it on March 10. Continental submitted the report to Sees, the expert who ultimately testified for Continental, and to Deeb. Sees gave Continental his report on March 25, and Deeb gave his report to Continental on April 13, 1983. Both reports attacked Stecich's conclusions. Subsequently, Stecich made another report on December 9, 1983, which in large measure repeated his findings and conclusions of March 1 but which Continental did not see until January 1987 when it took Stecich's deposition. It is Continental's position in this court that

the December 9, 1983, report contained new matters that required the testimony of Deeb.

There are a number of reasons to reject Continental's argument that the December 9 report required an expert other than Sees and Molzahn. First, because the argument was not made in the trial court it should not be considered here. Indeed, Continental's response to the motion to bar contained the April 13, 1983, report of Deeb which Continental describes in this court as its offer of proof in the trial court. Understandably, that report was directed only to Stecich's March 1 report. Thus, the judge was told only that Deeb would testify to matters known to Continental for more than four years.

The record does not reflect any excuse for the failure to identify Deeb as an expert witness in spite of repeated orders by the trial judge. It was not until the judge barred Metz from calling an expert that Continental named Sees and Molzahn. Since Continental possessed a report by Sees which was made before the Deeb report, we can fairly infer that economy dictated that Continental choose only one gasket expert and that it chose Sees.

Continental now tells us that Molzahn was not an expert on gaskets, thereby necessitating Deeb's testimony. However, the judge was informed by Continental's answers to interrogatories that Molzahn would testify on the question of whether the gaskets were appropriate. Any reasonable person would conclude that Continental was holding out Molzahn as an expert on gaskets. Under all these circumstances, we cannot say that the record clearly demonstrates that the judge abused his discretion when he entered the pretrial order barring Deeb and Skinner. He could do no more than act on what was before him.

Another reason for rejecting Continental's argument is that the evidence at trial failed to establish any prejudice to Continental. In our judgment Continental was given every opportunity to rebut the opinion of Stecich.

Both Molzahn and Sees testified that in their opinion the pipes cracked because of "differential settlement," which we interpret to mean "the uneven laying of the pipes." They disagreed with Stecich's opinion that the compression of the gaskets had caused the pipes to crack. Sees, who was proffered as an expert on gaskets, expressly disagreed with the March 1 report of Stecich. However, he was never asked any questions about his opinion of the December 9 report. At the trial Continental made no attempt to show that its expert opinion proof was limited by the previous ruling.

Continental argues in this court that Deeb was more expert than

Sees and would have disputed the results of tests made by Stecich after the March 1 report. Again, however, that argument was never made in the trial court either before or during the trial. Sees testified that he was very familiar with gaskets. It was his opinion that the compression-strength test and gasket test that Stecich conducted "were in nonconformance with all applicable engineering principles." He disagreed with the results of Stecich's tests which he believed were based on inadequate samples. He specifically criticized Stecich's conclusion that the spigots would crack as a result of the excessive bending stress on the spigots that resulted from the compression of the rubber gasket. Locke also criticized Stecich's method of testing. We repeat that Continental has failed to establish that it was foreclosed from rebutting any testimony of Stecich.

■ We conclude our discussion by noting that it is difficult to see how the judge could have arrived at any conclusion on the question of liability other than the one he did. Unlike Stecich, neither Molzahn nor Sees ever conducted any tests on the pipes. Molzahn admitted that other causes of the cracks included "adequate [sic] stress in the joining of the pipe." As we have noted, both Molzahn and Sees expressed the opinion that the uneven laying of the pipes caused the pipes to crack. In other words, the pipes were laid in such a way that the pressure on the pipes became distributed unevenly. It was Stecich's opinion that the problem was created at the joining of the pipes. All of the cracks appeared at the joints and none in the barrel portion of the pipes. We agree with the argument made by Century in the trial court, as apparently so did Sees, that, accepting Sees' opinion as to the cause of the cracks, the probability of the cracks appearing in only the joints along the entire line that had been laid was mathematically almost nonexistent. In short, the judge's ruling did not create a manifest injustice. (See *Mitchell v. Wayne Corp.* (1989), 180 Ill. App. 3d 796, 536 N.E.2d 241.) For these reasons, it is our judgment that Continental has failed to establish an abuse of discretion on the part of the judge in barring Continental's proffered expert witnesses.

Continental next contends that the judge erred in precluding a showing of a videotape of a sewer line during the testimony of Molzahn. The admissibility of the tape in question first arose during the testimony of Joseph Perry, a foreman of Metz, who supervised the "teleinspection and grouting" of the pipes. Continental sought to lay a foundation for the introduction of the tape through Perry's testimony. The judge denied admission of the tape on the ground that Perry could not determine which portions of the tape actually de-

picted which portions of the line of pipes on a certain date. No error is assigned to this ruling.

Molzahn testified that he had seen the tape before testifying and that, as an engineering expert, he would normally rely on videotapes to investigate the failure of a sewer line. He said that if he viewed the tape in court, he could identify where the problems in the pipe occurred. The judge denied Continental the right to show the tape.

Continental relies on *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, to support its claim that the judge's ruling denying it the right to show the tape was error. *Wilson v. Clark* does not support Continental's position. That case simply adopted a Federal rule of evidence which permits an expert to give his opinion on the basis of facts *which have not been admitted into evidence*, if they are of a type reasonably relied upon by experts in a particular field in forming opinions. It does not say an exhibit previously ruled inadmissible becomes admissible when an expert says he examined it.

■ The record indicates that the judge did permit Molzahn to rely on the tape in establishing his opinion. Moreover, Molzahn denied relying on the tape for a significant portion of his testimony. Consequently, there was no prejudice to Continental, and the evidence would not materially have affected the result. (See *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.) It is within the court's discretion to determine whether a party may present demonstrative evidence to clarify an expert's testimony. (*Schaffner v. Chicago & North Western Transportation Co.* (1987), 161 Ill. App. 3d 742, 515 N.E.2d 298, *aff'd* (1989), 129 Ill. 2d 1, 541 N.E.2d 643.) We find no abuse of discretion in the court's denial of the showing of the tape in question.

Continental's next contention of error is that Century failed to establish that it had effectively rejected the pipe.

The judgment order essentially consists of three parts. The judge first entered judgment on Continental's breach of contract claim. He specifically found that Century had accepted, retained and utilized 400 feet of Continental pipe and effectively rejected the remainder by a letter dated March 10, 1983. He then entered judgment for Metz on its complaint for an accounting and awarded Metz the sum of $28,642 for services rendered in videotaping, grouting and testing the pipe joints. Both awards were to be disbursed from a fund of $39,465 which the Village of Bridgeview had deposited pursuant to a court order. The funds remaining were to be disbursed first to Continental and then to Metz. Any funds remaining were to be disbursed to Century.

The judge then entered judgment on Century's counterclaim for breach of express and implied warranties. He specifically found that Continental had supplied defective pipe and, thereby, breached its contract and warranties; he awarded Century the sum of $274,524 in damages. The damages related to all costs associated with the unsuccessful repair of the sewer line and the ultimate replacement of the line. He awarded an additional 15% for the indirect cost of overhead and specifically denied any award for profit.

■ Continental first asserts that Century should not have recovered because it failed to plead that it had rejected the pipe as a "theory of recovery" or as an "affirmative defense." The cases cited by Continental to support this argument involve the statute of frauds, lack of consideration and unenforceability. These defenses clearly constitute affirmative defenses. But Continental has not cited, nor has our research disclosed, any case holding that rejection is an affirmative defense.

Moreover, any defect in a pleading is waived by failure to object when evidence is introduced at trial on an unpleaded theory of recovery. (*Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 377 N.E.2d 21.) Throughout the trial, Continental failed to object to the admission of any of the documents which reflected the costs incurred for testing, repair or replacement or to the admission of correspondence reflecting rejection. Continental's cross-examination reveals it was clearly aware of the potential relevance of the issues of acceptance and rejection. If there was any requirement to plead rejection, Continental waived it.

Continental next asserts that, assuming Century properly pleaded rejection, Century failed to prove rejection. The contract between Century and Bridgeview provided that the pipe manufacturer was to certify that the pipe and joint materials were capable of withstanding the infiltration test as required by the specifications for the sewer job. Because the infiltration test was not scheduled to occur until after at least 1,200 feet of pipe had been laid, Century's "use" of the material was necessary to determine whether it conformed to the contract. Throughout installation, Century visually inspected each pipe for proper installation and cracking. The alignment, bedding and grade were checked repeatedly, and the Village engineers were satisfied with the installation up to the time the pipes failed the infiltration test. The defect was revealed only after the pipes was structurally analyzed because the line had failed to pass the infiltration test. Expert testimony indicated that the line failed due to leaks which were caused by cracks due to compression. The defect appeared only after

the pipes were actually joined and installed underground.

■ As is obvious, the rejection of goods may not occur until after the buyer is aware that the goods are defective. Century stopped laying pipe immediately after the line failed the infiltration test. It immediately notified Continental of the extensive cracks revealed by its initial telegrouting attempt. Continental repeatedly denied any problem with the pipe and threatened Century with a lien. Because it was still under contract with the Village to construct the sewer line, Century had no choice but to continue its efforts to determine the cause of the cracks and to repair them as best it could. Century ordered additional videotaping with Continental's concurrence and retained consulting experts to determine the cause of the pipe's failures.

■ It is for the trier of fact to determine whether conduct amounts to acceptance or rejection and whether notice of rejection is reasonable and sufficient. (*Alden Press, Inc. v. Block & Co.* (1988), 173 Ill. App. 3d 251, 527 N.E.2d 489.) As the trier of fact, the judge determined that Century effectively rejected the pipe by its letter of March 10, 1983. That letter indicated that Continental's pipe was defective; it acknowledged that attempts to rectify the problems had failed; it advised Continental that it would begin repair activity and hold Continental responsible for all costs and damages suffered. The judge's finding that the letter of March 10, 1983, was a sufficient and timely rejection of the goods was not contrary to the manifest weight of the evidence.

Century has advanced the alternative arguments that the evidence also established a revocation of acceptance, assuming that the proof of rejection was insufficient and that proof of rejection is unnecessary in actions for breach of warranty. In view of our conclusion that the evidence established an effective rejection, we need not consider these alternative arguments.

Continental's last contention is that the damages award is inconsistent. It first claims that Century failed to mitigate the damages and bases its claim on the fact that the specifications for the job and the Metropolitan Sanitary District requirements provided that "[u]nless otherwise specified or directed by the Engineer, the first section of sanitary sewer constructed of approximately 1200 feet in length shall be tested." Century did not test the line until 1,800 feet of pipe had been laid. We fail to see how the requirement which was imposed on Century by the Village and the Metropolitan Sanitary District can be invoked by Continental as proof that Century had failed to mitigate damage caused by Continental. Moreover, Kachavos explained that he tested the sewer line at 1,800 feet because it represented the

completion of the first phase of construction. He also testified that the Village engineer instructed him to conduct the infiltration test accordingly.

Most important, however, is the rule of law, based on common sense, that the duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware "of facts which make [the duty to mitigate] necessary." (15 Ill. L. & Prac. *Damages* §91 (1968).) As we have noted in discussing the question of rejection, Century did not become aware of any facts which made any duty to mitigate necessary until after 1,800 feet of pipe had been laid and the pipe failed the infiltration test. Continental had the burden of proof to show any failure to mitigate damages and has not done so. *Casey v. Baseden* (1986), 111 Ill. 2d 341, 490 N.E.2d 4.

Continental also asserts that it was "unduly penalized" by "inflated damages" in that it was required to pay for the replacement pipe at the cost of $7.50 per foot while the contract price was only $6.75 per foot. The replacement pipe was longer, thicker and had a different gasket. Continental also takes issue with the percentage of profit awarded to Century.

First, the judge did not enter any award for profit. Second, Kachavos testified that he purchased the same type of pipe, Class 5, O ring, ASTM C-443 concrete pipe. He also testified, without rebuttal, that the differences between the gaskets and the thickness of the pipes were only cosmetic. Continental itself followed the trend of the industry and began manufacturing and distributing a longer and thicker version of Class 5 pipe in 1984 which utilized a different bell design, thereby requiring a different type of gasket. In light of these facts, the judge could reasonably have concluded that the differences between the original and replacement pipe were irrelevant and did not constitute an "upgrade." Continental has failed to prove that Century acted unreasonably or deliberately incurred excessive costs at its expense.

Continental's last contention is that Century received a double recovery on one item of damages. The Village of Bridgeview deposited $39,465 with the court and was dismissed from the actions brought by Continental and Metz to enforce their liens against Century. That sum represented the final amount owed by the Village to Century out of a total contract price of $199,314. The judge ordered $2,754 paid to Continental for the 400 feet of pipe used by Century in the replacement line; $28,642 paid to Metz; leaving a balance of $8,069 to be disbursed to Century.

Continental's position is that Century is not entitled to the $8,069

because Century has already received damages for the cost of the replacement pipe in the breach of warranty award. Century responds that the judgment order merely reflects two aspects of the case: the amount paid by the Village represents the cost of *installing* the pipe, and the award from Continental represents the *costs* associated with the attempted *repairs* of the original pipe and the installation of the *replacement* line.

■■■ We have concluded that we need not decide this question because we judge that Continental lacks standing to raise this argument. During oral argument in this court, the attorney for Continental conceded that Continental was not entitled to the money and expressed the view that "maybe [it will] go back to the Village of Bridgeview." Continental has cited two cases from other jurisdictions which do not address the question of standing. Both cases involve double recovery by the buyer from the seller and not from any third party.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

LaPORTA, P.J., and McNAMARA, J., concur.