JAMES T. GAUSSELIN, Plaintiff-Appellant, v. COMMONWEALTH EDISON COMPANY, Defendant-Appellee.

First District (6th Division)   No. 1—92—2939

Opinion filed March 18, 1994.

Anesi, Ozmon & Rodin, Ltd., of Chicago (Stephen S. Phalen, of counsel), for appellant.

Paul E. Kelly, of Hoffman, Burke & Bozick, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, James Gausselin, brought this action to recover for injuries he sustained while working at a nuclear power facility owned and operated by defendant, Commonwealth Edison. In count I of his complaint, plaintiff alleged violations of the Illinois Structural Work Act (Ill. Rev. Stat. 1991, ch. 48, par. 60 *et seq.*). In count II, he alleged common law negligence. A jury returned a verdict in favor of defendant on both counts and the trial court entered judgment on the verdict. On appeal, plaintiff contends that the trial court erred in

(1) refusing to give the jury separate verdict forms for each count of his complaint; (2) allowing an undisclosed expert witness to testify for defendant; (3) allowing documents into evidence which defendant failed to produce prior to trial; and (4) admitting into evidence a photograph without sufficient foundation.

The relevant facts are as follows. On December 14, 1984, plaintiff was injured while working on a scaffold at defendant's La Salle Nuclear Power Plant ("La Salle"). At the time of the injury, plaintiff was employed as a pipefitter by Morrison Construction Company and was working, along with several other Morrison employees, at the La Salle plant. On the date in question, plaintiff and an apprentice pipefitter, Ed Patz, Jr., were assigned to unbolt a flange on the end of a pipe attached to a vapor body in the "rad waste" building at La Salle. Different types of radioactive waste are processed in vapor bodies in that building. Before going to the rad waste building, Gausselin and Patz obtained a radiation work permit and the necessary authorization to enter the rad waste building. They then received protective clothing from defendant's "rad chem" department. Gausselin asked one of the technicians whether the flange he was opening was pressurized because he wanted to know if there was potentially radioactive water in the line, but the technician said he did not know. According to plaintiff, it was customary for defendant to drain any pipes needing repair before Morrison employees began to work on them; Morrison employees had no authority to do so on their own.

The pipe and flange plaintiff and Patz were instructed to repair were approximately 10 feet from the floor. The flange was 18 or 24 inches in diameter and weighed about 80 pounds. Plaintiff and Patz had to climb a scaffold to reach them. The scaffold was already assembled, and plaintiff made no attempt to move it. Several tools were on top of the scaffold. Plaintiff did not touch or move these tools because he thought they might be contaminated. Plaintiff agreed that, as far as the location of the flange was concerned, there was nothing wrong with the placement of the scaffold.

Plaintiff and Patz climbed on top of the scaffold and began removing the 14 to 20 bolts securing the flange to the pipe. The deck of the scaffold was approximately two to three feet below the top of the flange, and it was necessary for plaintiff to squat down while he repaired the flange. The flange extended into the scaffold approximately six inches. Plaintiff loosened the bolts in a "crisscross" motion because he "wanted the [flange] to come off nice and easy." Plaintiff stated that as they loosened the bolts, "some water came out" and "all of a sudden, the flange popped off." Plaintiff, still in a squat position, quickly twisted around and landed on top of the tools when a spray of water came out "a good two feet in the air." Plaintiff

and Patz quickly got up and "rushed the plate, put our weight on the plate" and "started tightening up the bolts." Plaintiff said that he felt pain in his right knee when he landed on the tools.

Plaintiff stated that a couple of gallons of water came out of the pipe before they reattached the flange. His boots got wet, but plaintiff did not receive any contamination from this incident. Plaintiff did not know if the water flowed down a drain in the room, but agreed with another witness that sometimes workers would tape over drains.

Once on the ground, plaintiff told Joe Feisel, the Morrison employee stationed outside the rad waste building, to call his foreman, Tom Faubel, and the head foreman, Bob Jahnke, and report that the pipe contained pressurized water. Later that day, plaintiff reported the incident to both Faubel and Jahnke. At the end of his shift, plaintiff drove himself home from work. His knee was swollen and painful when he arrived home.

Plaintiff did not see a doctor over the weekend following the incident because he wanted to see the company doctor on Monday. The doctor was not in on Monday and plaintiff did only light work that day. On Tuesday, he again reported to work and saw the company doctor at a nearby hospital. He told the doctor's nurse about a fall he took a few weeks before December 14, in which he hit his knees on the floor. He said he experienced no pain or other problems from that fall. Plaintiff did not tell the doctor that he was injured as a result of water spraying out of the pipe.

Plaintiff continued to work the rest of the week, taking pain pills prescribed by the doctor and performing only light work. Plaintiff then called his family physician, Doctor Lambur, but could not get an appointment until January 16, 1985. Doctor Lambur performed tests on the knee on January 21. Plaintiff subsequently underwent surgery to his knee and eventually returned to work in April.

Doctor Lambur testified on plaintiff's behalf and stated that plaintiff told him that he was injured at work while trying to avoid "a splash of water." Doctor Lambur performed surgery on plaintiff's knee on January 30, 1985. He testified that plaintiff's explanation of how the injury occurred was consistent with the problems he saw in the knee during surgery.

Jahnke also testified for plaintiff. Plaintiff told him on December 14 that he and Patz were unbolting a flange when he was sprayed with contaminated water and twisted his knee on the scaffold. Jahnke noticed that plaintiff was limping. After the incident, Jahnke went into the room where plaintiff had been working and noticed a gallon or two of water on the floor. Jahnke opined that the water came from the flange. After viewing the room, Jahnke reported the incident to Tim O'Connor, one of defendant's field engineers.

Jahnke stated that Morrison "takes [defendant's] word" that the pipes to be repaired have been drained. Morrison has no authority to drain the lines. He explained that a pink sheet is customarily attached to the work package Morrison gets from defendant for a repair job, which indicates whether the piping system is running that day and whether there is any pressure in the pipes. According to Jahnke, the work package admitted at trial was incomplete because the pink sheet was missing. Jahnke stated that the work could not be completed without this sheet.

Jahnke was aware that La Salle had a comprehensive draining system leading to holding tanks. He stated that these water holding tanks "used to fill, and then, overfill onto the floor, and then, out the door." According to Jahnke, none of the water from the pipe plaintiff was repairing could have flowed into the holding tanks because the drain in the rad waste room had been taped by Morrison employees "so no water would go down it."

Faubel testified next for plaintiff. As foreman, Faubel was responsible for filling out accident reports whenever a Morrison worker was injured. On December 19, 1984, Faubel completed such a report for plaintiff. The report, which was admitted into evidence, explained plaintiff's account of the incident and stated: "When unbolting the flange, water leaking [sic] out, Gausselin moved back, hitting his knee on the pipe" because "[the] line was not drained correctly by [defendant]." The report described the injury as "a swollen right knee." Faubel testified that plaintiff told him about the accident on December 14, but he did not have time to complete the accident report until December 19.

Plaintiff called William Heilman to testify as a safety expert. He based his opinions on a document explaining the general conditions of work performed at the plant, a transcript of plaintiff's deposition, and a sworn statement given by Patz. Heilman, a safety engineer and safety consultant, opined that "the scaffold used was not a safe, suitable and proper one in that it was not properly placed." Heilman concluded that the scaffold was at the wrong height for the work being done and "contained extraneous materials left on it by previous users ***, which is not allowed." He testified that the work environment violated the Structural Work Act, various OSHA standards, and other customs and practices in the industry. According to Heilman, the tools should not have been left on the scaffold, the scaffold should have had a guardrail, the scaffold's placement should have been better inspected, and plaintiff should have been instructed in proper scaffold use and flange removal. The pipe should not have been pressurized.

Plaintiff called an employee of defendant as an adverse witness. Timothy O'Connor was a field engineer in December 1984 and was responsible in part for overseeing the work of Morrison employees. O'Connor stated that plaintiff had the authority to move the scaffold anywhere he desired.

O'Connor further stated that defendant monitors the level of water located in the process systems and would detect a decrease of as little as three or four gallons from the system. In the event of a release of water from a given pipe, the water would go down a drain leading to the holding tanks and defendant would "document it in a log, either the shift engineer's log or the liquid rad waste log." O'Connor was familiar with the custom and practice of completing these logs, although it was not his job to complete either log. O'Connor testified that a release of water from an open flange of the sort described by plaintiff would have been recorded on these logs. On December 14, no such recordation was made. He acknowledged that the beginning and ending levels in each tank were not listed on the logs, and that an anticipated level change or a *de minimis* change would not be recorded.

Plaintiff had earlier objected to defendant's use of the shift engineer's and liquid rad waste logs, as well as various other documents, on the ground that they had not been timely disclosed in compliance with his pretrial production requests. Defendant did not produce the documents until after the jury had been selected. Defendant argued that plaintiff did not request these particular documents in any of his requests, and the trial court, upon reviewing the documents, agreed. Plaintiff's objection to the use of the documents was accordingly overruled.

Prior to the completion of plaintiff's case in chief, defendant gave plaintiff some additional documents which plaintiff had never before seen. Defendant informed the trial court that the documents were going to be used during its examination of Larry Ellis to rebut Jahnke's testimony concerning the inspection of the rad waste room in which plaintiff was injured and the drain located therein. Plaintiff objected to the use of these documents, again on the basis of untimely disclosure. The trial court ruled that the documents could be used during Ellis' testimony to rebut the testimony of Jahnke. The court later gave plaintiff permission to take a short deposition of Ellis before he testified.

Before calling Ellis to testify, defendant presented the testimony of Patz and Fiesel. Patz recalled working on a scaffold with plaintiff to repair a flange in the rad waste building but stated that nothing unusual happened; water did not squirt out of the pipe. After they

completed the job, they left the room. On the way out of the room, plaintiff complained to Patz that his knee hurt. Patz could not remember anything about the scaffold and could not remember if they were taking the flange off the pipe or attaching it to the pipe. Nor could Patz recall whether there was water on the floor. On cross-examination, Patz testified that it was entirely possible that there was water on the floor of the rad waste room that day and that plaintiff was injured while on the scaffold. He simply did not remember.

Fiesel testified that he recalled plaintiff injuring his knee. He could not remember the exact date of plaintiff's accident, but did recall the rad waste room in which it occurred. Fiesel did not remember plaintiff telling him that the flange popped off and water sprayed out, although this was something he would remember if it had happened. Plaintiff told him that he had hurt his knee and that the injury "had something to do with the scaffold, *** as he was coming off the scaffold, he stepped on a tool or fitting." Fiesel did not recall making any report about spilled water to a shift foreman or to defendant's rad waste department.

Defendant's final witness was Ellis. In 1984, Ellis was a field engineer for defendant who supervised construction at La Salle. Ellis did not have firsthand knowledge of plaintiff's accident. Ellis was not questioned about any special qualifications he might have to testify.

Ellis identified various documents to which plaintiff objected, including the shift engineer's and liquid rad waste logs, a log and various building surveys from the radiation protection department, a radiation work permit (RWP) log sheet, an RWP from December 14, 1984, a radiation dose history for both Jahnke and plaintiff, a general arrangement drawing of elevation 735 of the rad waste building, and a nuclear work request. Ellis obtained these documents for the defense attorney and stated that they were kept in the ordinary course of defendant's business. He acknowledged that they were compiled in anticipation of his testimony and that he was not responsible for making any of these reports in 1984.

Ellis testified about rad waste building surveys completed by the radiation protection department. According to Ellis, the surveys are used to ensure that radiological and other conditions in the rad waste rooms are stable. As part of his job, Ellis would request and interpret these surveys. Part of the survey introduced at trial showed the vapor body—which Ellis described as a tank which is part of a system that separates liquid rad waste from heavier solids of rad waste—located in the room where plaintiff was working on December 14, 1984. The survey also showed the drains in the rad waste room and

also showed that there was some garbage in the room. Over objection, Ellis stated that any covering of a drain and any water on the floor would be indicated on the survey, and that in this case none was. The scaffold and other "junk" left behind by workers were also indicated on the survey.

Also over objection, Ellis identified a photograph of the vapor body and was asked whether the picture accurately reflected the appearance of the rad waste room on December 14, 1984, to which Ellis responded that it did, except for the absence of the scaffold. Ellis stated that based on the condition of the flooring, insulation and piping detected in the photograph, he believed the photograph was taken in 1983. Counsel for plaintiff renewed his objection to the photograph, and the trial court inquired as to what changes there were from the photograph and the appearance of the room on the date in question. Ellis again stated that except for the presence of the scaffold and workmen on the date in question, everything else, including the type of equipment in the room, was the same. Plaintiff's objection was overruled.

Ellis explained the workings of the vapor body in detail, and stated that it would be obvious if the system was operating due to the heat emanating from the system. However, he had never seen a vapor body operate.

Ellis explained the significance of the radiation protection department log. He stated that water on the floor of any rad waste room would be recorded on this log, as would a situation involving a flange popping off and water squirting. He listed instances where water was noted on the log and explained that none of them involved any water leaking in the room where plaintiff and Patz worked on December 14. Plaintiff's objections to Ellis' testimony in this regard were overruled.

Similar objections were made by plaintiff and overruled by the trial court when Ellis testified about the documents O'Connor used, namely, the shift engineer's log and the liquid rad waste log. Ellis testified that both documents would note a release of water like the one described by plaintiff if a release actually occurred, but then qualified his answer by explaining that "if that's more than two gallons or three gallons, I would say yes, it would be detected by something, an instrumentation of some type." Neither log showed any water spill on December 14.

Over plaintiff's objection that Ellis had no personal knowledge to support his statements and was only reading from the records, the trial court allowed Ellis to testify next about the RWP log defendant kept and whether an RWP was issued for Jahnke on December 14.

Ellis testified that, while an RWP was issued for plaintiff on December 14 so that he could repair the pipe in the rad waste room, no RWP was issued for Jahnke on that date or on any date as far back as September of that year. Further, according to his radiation dose log from December 3 through December 16, Jahnke's dose reading was zero, meaning that he did not come into contact with any radioactive sources or come near any radioactive materials during that time. Based on the RWP logs, it did not appear that Jahnke received the necessary authorization to enter the rad waste building on December 14. When Ellis went into the room where plaintiff was injured, when the system was shut down, he received 40 or 50 millirems of radiation. According to Ellis, it would not be physically possible to enter the room and not receive some measurable radiation. Ellis explained that the protective clothing worn to enter the rad waste building is "not really intend[ed] *** to block out radiation, [but to] keep contamination from the person's body." Ellis also stated that there was no reference to Jahnke being fitted for a mask until 1986, which would be worn whenever a worker entered a high radiation area at the plant.

Ellis also testified that the nuclear work request had an indication which verified that the vapor body was out of service before plaintiff began working on the pipe on December 14. Ellis explained that when the system is out of service, it has no pressure. On the other hand, when the system is in operation, if a manway were to be opened, steam, rather than water, would escape. Based on a review of various documents, Ellis concluded that the system was out of service on December 14. He stated that the pink sheet mentioned by Jahnke would have been removed as soon as the work was completed, per usual practice.

Over objection, Ellis testified that if a worker had been splashed with water from the vapor body system, this "personal contamination event" would be documented. In such a situation, radiation and contamination levels would be high. Ellis searched for documentation regarding plaintiff's incident, but found none. Looking at plaintiff's radiation dose log, Ellis determined that plaintiff was not subjected to any radiation in December 1984 because his dose rating was zero for that month.

At the instructions conference, plaintiff tendered four separate verdict forms. Verdict form A was to be used by the jury if it found in favor of plaintiff on the structural work count. Verdict form B was to be used if the jury found in favor of plaintiff on the negligence count. Verdict forms C and D were to be used if the jury found in favor of defendant on each count, respectively.

The trial court refused the four verdict forms offered by plaintiff on the ground that they might confuse the jury into believing that separate awards under each count were permissible. The court instead gave the jury two general verdict forms, one in favor of defendant and the other in favor of plaintiff.

In closing argument, plaintiff stressed that he only had to prove one count of the two-count complaint in order to prevail, and outlined explicitly the damages he was seeking. Counsel for plaintiff stated:

> "In regard to the two final counts, we have to prove one of the things by this burden of proof to recover in this case. We don't have to prove all of them. If we prove one thing under the Structural Work Act case, we win. And if we prove one thing under the negligence count, we win. It's not one or all or nothing. It's not all the above just like multiple choice."

The jury was later instructed that if it found plaintiff had proved either the Structural Work Act violations or negligence, it should return a verdict for plaintiff. The jury subsequently returned a general verdict in favor of defendant. This appeal followed.

Plaintiff first contends that the trial court committed reversible error by failing to give the jury separate verdict forms for each count of his complaint. As a result, plaintiff asserts, it is impossible to know for certain whether the jury properly applied the law.

The form of verdicts is a matter within the sound discretion of the trial court. (*Kure v. Sluski* (1989), 186 Ill. App. 3d 472, 542 N.E.2d 1152.) The law regarding separate verdicts is clearly set forth in section 2—1201(c) of the Code of Civil Procedure:

> "(c) If there are several counts in a complaint, counterclaim or third-party complaint based on different claims upon which separate recoveries might be had, the court shall, on the motion of any party, direct the jury to find a separate verdict upon each claim." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1201(c).)

The joint committee comments to this subsection explain:

> "Separate verdicts are appropriate only when recovery on different demands is sought in the same complaint. Therefore, the words 'upon which separate recoveries might be had' have been added, making clear that the *provision authorizing separate verdicts applies only to separate causes of action based upon separate transactions.*" (Emphasis added.) Ill. Ann. Stat., ch. 110, par. 2—1201, Joint Committee Comments, at 4 (Smith-Hurd 1983).

■ In light of the statute and comments, it appears evident that separate verdicts were not required in this case. Plaintiff's complaint against defendant consisted of two counts—one based upon alleged violations of the Structural Work Act and the other upon common law negligence. However, both counts arose from a single transac-

tion—the accident resulting in injury to plaintiff—for which a single recovery of damages was sought. Since the two counts did not constitute "separate causes of action based upon separate transactions," the provisions of section 2—1201(c) were inapplicable and separate verdicts were not required.

This court reached the same conclusion in *Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 383 N.E.2d 1242, a case factually similar to the present case. There, the plaintiff filed a two-count complaint against several defendants, alleging he was injured while driving over a bridge where telephone wires were being repaired by those defendants. The plaintiff alleged a roads and bridges act violation in count I and common law negligence in count II. The trial court refused the request of one of the defendants for separate verdict forms, deciding instead to give the jury general verdict forms in favor of or against each defendant. Citing the language of section 2—1201(c) (then section 68(c)), this court held that separate verdict forms were not needed since the two counts were based not on separate transactions, but on one individual accident which was alleged to have caused the plaintiff's injury. *Richard*, 66 Ill. App. 3d at 837, 383 N.E.2d at 1253.

The cases plaintiff here cites in support of his argument, *In re Estate of Payton* (1979), 79 Ill. App. 3d 732, 398 N.E.2d 977, and *Eggimann v. Wise* (1963), 41 Ill. App. 2d 471, 191 N.E.2d 425, are factually distinguishable and are therefore not controlling.

On the basis of the foregoing, we hold that the trial court did not abuse its discretion in refusing plaintiff's tendered verdict forms. The two general verdict forms allowed the jury to find for plaintiff on either of his two causes of action and to find for defendant if neither cause of action was proven, thus satisfying the requirement that the forms "cover every possible finding under the evidence from the viewpoints of [both] parties." (*Kure*, 186 Ill. App. 3d at 475, 542 N.E.2d at 1154.) Had there existed any possibility of confusion on the part of the jury as to the manner in which plaintiff could prevail, the trial court's instruction and plaintiff's comments in closing argument, that it could find in plaintiff's favor if either one of the two counts was proven, were sufficient to eliminate it. Plaintiff's claim is without merit.

Plaintiff next contends that the trial court abused its discretion in allowing Ellis to testify for defendant as an expert witness when defendant failed to disclose him as an expert prior to trial. Defendant contends that plaintiff has waived this issue on appeal because he failed to object to Ellis' testimony on this basis at trial. We agree.

As previously stated, prior to the close of plaintiff's case in chief,

defendant informed the trial court and plaintiff that it was planning to call Ellis to rebut the evidence offered by plaintiff which supported his claim that he was sprayed with radioactive water while repairing the flange. At this point, defendant apparently gave plaintiff a copy of his radiation dose sheet relating to the date in question, log sheets from the radiation protection department and some survey maps, which it intended to introduce through Ellis as part of the rebuttal evidence. Plaintiff offered no objection at this time to defendant's decision to call Ellis as a witness.

Later, prior to Ellis' testimony, plaintiff voiced his objections to the use of the records on the ground that they had not been timely produced. Again, plaintiff failed to object to Ellis being called as a witness, expert or otherwise. Moreover, during the extensive direct examination of Ellis, plaintiff never raised Rule 220 as an objection, nor did he ever complain that Ellis was offering expert testimony. The record reveals that plaintiff's objections were limited to such grounds as lack of foundation as to some of the reports, speculation, leading, and relevance. Significantly, at one point when Ellis was testifying as to the maximum radiation dosages allowable by law, counsel for plaintiff objected solely on relevance grounds, to which the trial court responded, "Anything else?" and to which counsel stated, "Nothing further:" The trial court overruled counsel's objection on this ground, and, in light of no further objections, Ellis was allowed to proceed.

In addition, after defendant revealed that Ellis would testify to the records given to plaintiff that day, plaintiff requested leave to take a short discovery deposition of Ellis, which the trial court granted. After that deposition, however, plaintiff made no motion to bar, strike or in any way limit Ellis' testimony on Rule 220 grounds. Nor did he base his later motion for a mistrial on the ground that Ellis had testified as an "undisclosed expert witness." The first time plaintiff raised his Rule 220 objection to Ellis' testimony was in his post-trial motion.

The law is well settled that, to preserve an issue for appellate review, a party must make the appropriate objections in the trial court or the issue will be deemed waived. (*Akers v. Atchison, Topeka & Santa Fe Ry. Co.* (1989), 187 Ill. App. 3d 950, 543 N.E.2d 939.) Moreover, when an objection is made, specific grounds must be stated and other grounds not stated are waived on review. (*Akers*, 187 Ill. App. 3d at 958, 543 N.E.2d at 945; *Brumley v. Federal Barge Lines, Inc.* (1979), 78 Ill. App. 3d 799, 396 N.E.2d 1333.) The purpose of the requirement that a specific objection be made is to allow the court an opportunity to properly consider and rule upon it. *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 496 N.E.2d 1116.

■ Applying these principles to the present case, we cannot conclude that the trial court abused its discretion in allowing Ellis to testify as an "undisclosed expert witness," since plaintiff never presented that argument to the trial court for a ruling. The preliminary question of whether Ellis was even an expert was never raised in the trial court. There can be no ground for error when no objection is made. *Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 581 N.E.2d 162.

The fact that plaintiff raised the issue in his post-trial motion is insufficient to preserve this issue for review. "A party cannot sit on his hands and let perceived errors into the record and complain of those errors for the first time in a post-trial motion." (*Pharr*, 220 Ill. App. 3d at 515, 581 N.E.2d at 166; *Brumley*, 78 Ill. App. 3d at 806, 396 N.E.2d at 1339.) The issue is waived.

Plaintiff next contends that the trial court erred in allowing into evidence the documents defendant produced after the trial had already begun, including those introduced during the testimony of Ellis. Plaintiff maintains that these documents were the subject of previous production requests and should have been excluded in light of defendant's failure to produce them either before trial or prior to selection of the jury, in keeping with his requests and with the applicable rules of discovery.

The record reveals that on August 22, 1986, plaintiff sent defendant a Rule 214 request to produce (134 Ill. 2d R. 214) seeking, among other things, "[a]ny and all work progress reports and job logs for a ninety (90) day period of time prior to the date of the occurrence which is the subject matter of this lawsuit, and for a thirty (30) day period of time subsequent thereto." Plaintiff also requested defendant to produce "[a]ny and all employment records, payroll records, and medical records of the Plaintiff."

The Rule 237 notices to produce at trial (134 Ill. 2d R. 237) which plaintiff filed on September 26 and November 13, 1991, made substantially similar requests of defendant but ordered that the documents be produced at trial, prior to selection of the jury.

On the morning of April 15, 1992, the day after the jury was selected, counsel for plaintiff objected to the documents which defendant had just tendered to him and made a motion to exclude them due to their untimely disclosure. The trial court allowed counsel one-half hour to review these documents and stated that it would decide plaintiff's motion after lunch.

At the hearing on the motion, counsel for plaintiff argued that he had requested "all logs and diaries relating to the day of the accident" but did not receive any from defendant until that morning. In re-

sponse, defense counsel stated that none of the documents tendered to plaintiff were "job logs," and also that the documents had just been discovered the day before and were given to plaintiff at the earliest opportunity. Plaintiff responded that the documents were "akin to job logs," to which the trial court replied, "It may be akin to job logs, but they're not job logs." The trial court accordingly denied plaintiff's motion and allowed defendant to use the documents at trial.

The next dispute arose on April 20, 1992, just prior to the close of plaintiff's case in chief. Before the trial court called the jury back from lunch, defense counsel informed the trial court that he had just given plaintiff's attorney the records which he intended to introduce through Ellis to rebut Jahnke's testimony regarding the covered drain and the inspection he allegedly performed of the rad waste room shortly after the accident. At a hearing on this issue held later that day, plaintiff's attorney contended that counsel for defendant denied having any of these documents at a "237 conference" the parties apparently participated in, argued that the documents were "clearly prejudicial," and urged the trial court to bar defendant from using them. In response, defense counsel argued that the documents had not been requested in plaintiff's Rule 237 notice to produce and that, as with the other documents, their existence had just become known and had been tendered to plaintiff at the earliest opportunity. Counsel explained that since "Thursday night after Mr. Jahnke testified *** I have been frantically having Mr. Ellis look for documents to rebut that." The judge ruled that the documents were admissible to impeach plaintiff's witness and denied plaintiff's motion. At the close of defendant's case, plaintiff moved for a mistrial, arguing that the admission of the documents did not comply with Rule 237. The trial court denied the motion.

The imposition of sanctions against a party for noncompliance with discovery rules is a matter within the broad discretion of the trial court. (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 504 N.E.2d 772.) The exercise of such discretion will not be disturbed unless an abuse is apparent. (*B&Y Heavy Movers, Inc. v. Fluor Constructors, Inc.* (1991), 211 Ill. App. 3d 975, 570 N.E.2d 777.) In determining whether noncompliance with discovery rules is unreasonable, the standard is whether the offending party's conduct can be characterized as a deliberate and pronounced disregard both for the discovery rules and for the court. (*Bautista*, 152 Ill. App. 3d at 532, 504 N.E.2d at 777.) Factors to be considered include surprise to opposing counsel, prejudicial effect, diligence of opposing counsel in seeking discovery, timely objection and good faith. *Bautista*, 152 Ill. App. 3d at 532, 504 N.E.2d at 777.

Here, the trial court found that defendant did not violate the discovery rules and, accordingly, refused to grant plaintiff's request to have the disputed documents barred.

Initially, we note that plaintiff has failed to make several important items part of the record on appeal, including all of the disputed documents, a transcript of the discovery deposition he took from Ellis after the trial had begun during which the nature of the documents was discussed, and a transcript of the sidebar conducted during O'Connor's testimony at which plaintiff's objection to some of the documents was heard. It is well settled that the "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error." (*Foutch v. O'Bryant* (1984), 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959.) As a general rule, "in the absence of such a record, it will be presumed that the trial court acted in conformity with the law and that it had a sufficient factual basis for its rulings." *Continental Concrete Pipe Corp. v. Century Road Builders, Inc.* (1990), 195 Ill. App. 3d 1, 10, 552 N.E.2d 1032, 1038.

■ While this court could well rest on plaintiff's failure to provide a complete record on appeal as the basis for rejecting his argument that the trial court erred in denying his motion to bar the disputed documents, we do not do so in view of an even more compelling reason for denying the relief he seeks, namely, his own failure to adhere to the applicable rules of discovery.

In its brief and at oral argument, defendant informed this court that it had filed an objection to that portion of plaintiff's Rule 214 production request calling for "any and all work progress reports and job logs" relating to the accident, on the ground that the request was vague and overbroad. Defendant did not deny possession of or control over the disputed documents, but merely sought clarification as to precisely what plaintiff was seeking. Plaintiff, however, failed to reply in any manner to defendant's objection. Plaintiff did not respond to this particular point in his reply brief, but admitted at oral argument that he in fact never formally responded to the objection.

Rule 214 requires that "[a]ny objection to the request or the refusal to respond shall be heard by the court upon prompt notice and motion *of the party submitting the request.*" (Emphasis added.) (134 Ill. 2d R. 214.) Plaintiff failed to file such a motion, apparently because he "had an understanding as to what was out there for this case." We have found no case law, however, and plaintiff has pointed us to none, which would permit a court to sanction a party for failing to respond to a discovery request filed by the opposing party, after objecting to that particular request and receiving no response to that objection.

Plaintiff contends that, while he did not formally respond to defendant's objection, he did engage in a "237 conference" with defendant regarding this issue and received assurances that none of the disputed documents existed. As with many other important items, however, plaintiff has failed to include documentation of this conference in the record on appeal. Therefore, other than plaintiff's bare assertion, no proof exists that such assurances were made.

It is apparent to us from the foregoing that the surprise plaintiff claims he experienced when he learned of the documents at trial was a result, not of bad faith on the part of defendant, but of his failure to discover before trial what documents defendant had in its possession or control. In addition to not following up on defendant's objection to his production request, plaintiff also failed to follow through with a pretrial discovery deposition of Ellis which he had scheduled, and therefore forfeited an opportunity to learn what defendant knew and what documents existed which might relate to the issues in the case. That defendant itself only discovered the documents on the eve of trial does not, contrary to plaintiff's assertion, necessarily prove that Ellis' deposition would have been fruitless as far as the disputed documents are concerned. Had the right questions been asked and the pertinent issues explored, plaintiff may well have discovered those documents about which he now complains.

We need not speculate, however, as to what may have transpired at Ellis' deposition. Our task is merely to determine whether the trial court abused its discretion in denying plaintiff's request to exclude the documents at trial. On the basis of the record before us, we cannot so conclude. We agree with the trial court that defendant's conduct did not violate the rules of discovery.

As to plaintiff's related contention that his radiation dose history fell within the request to produce all his "employment" and "medical" records and was not in fact produced before trial, we hold that plaintiff has waived this issue by failing to object on this basis in the trial court. *Akers*, 187 Ill. App. 3d at 958, 543 N.E.2d at 945.

Finally, plaintiff contends that the trial court abused its discretion in allowing into evidence the photograph of the vapor body. Plaintiff argues that the foundation for admitting the photograph was insufficient because Ellis, through whom the photograph was introduced, was unable to show that the photograph depicted the condition of the vapor body room on December 14, 1984. Defendant asserts that the photograph was offered for the limited purpose of showing the relationship of the vapor body to the floors, walls and ceilings in the rad waste room so that the jury would have a better

understanding of the equipment on which plaintiff was working at the time he was allegedly injured. Defendant offered the photograph for this limited purpose after plaintiff's expert witness testified that he did not know what a vapor body was or that plaintiff was working on one at the time he was injured.

The admission of photographs is a matter within the sound discretion of the trial court, whose decision we will not disturb absent a showing of abuse. (*Barreto v. City of Waukegan* (1985), 133 Ill. App. 3d 119, 478 N.E.2d 581.) Photographs portraying the scene of an incident are admissible to show the condition of the premises and are proper tools to aid in the jury's understanding of the condition of the property. (*Lundquist v. Nickels* (1992), 238 Ill. App. 3d 410, 605 N.E.2d 1373.) We find that the trial court properly admitted the photograph for defendant's stated purpose and that defendant sufficiently laid the foundation for such admission.

■ Ellis testified that the photograph accurately depicted the vapor body as it appeared in relation to the walls, ceilings and floors of the rad waste room on December 14, 1984. Ellis readily acknowledged to the jury that the photograph, taken sometime in 1983, did not depict the scaffolding and other objects related to the repairs that were being made in the room on that date. This acknowledgement served to clear up any potential confusion the jury may have had as to the precise condition of the room on the date in question. The admission of the photograph was proper.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.