2025 IL App (1st) 240687-U
No. 1-24-0687

SIXTH DIVISION
December 19, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ROSA BAUTISTA, | ) ) | Appeal from the Circuit Court of Cook County, Illinois, |
| Petitioner-Appellee, | ) ) | Domestic Violence Division |
| v. | ) ) | |
| ALFONSO TELLEZ, JR., | ) ) | No. 2023 OP 75502 |
| Respondent-Appellant. | ) ) ) | |
| | ) ) ) | The Honorable Sabra Lynne Ebersole, Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's entry of a plenary order of protection pursuant to the Illinois Domestic Violence Act of 1986. 750 ILCS 60/101 *et seq*. (West 2024).

¶ 2    Respondent-appellant Alfonso Tellez (respondent) appeals from the plenary order of protection that barred him from contact with his wife Rosa Bautista (petitioner), as well as the parties' two minor children, for a two-year period. For the following reasons, we affirm the circuit court.

¶ 3                                                  BACKGROUND

¶ 4      Respondent and petitioner are married and have two children together, a daughter born in 2014 and a son born in 2016.

¶ 5      On June 28, 2023, petitioner filed a *pro se* petition for an emergency order of protection against respondent, naming both children as protected parties. She alleged that the day before, when she asked respondent to get out of the bathroom so she could shower, he "close[d] the door with him still inside," "said he had needs and I had to get undress[ed] and showered with him looking at me." She stated that he "open[ed] the shower door to touch me even after I told him to stop." She also stated that "he was very pushy for me to sleep with him because I was his wife" after she told him she did not want to.

¶ 6      The petitioner also described an incident where respondent got mad after she arrived home from work later then he was expecting, and he "took my house keys and wanted to take my phone away." She expressed fear that he would harm her and the children for leaving.

¶ 7      On the same day she filed the emergency petition, petitioner appeared before the trial court. She stated that she had moved out of the marital residence that day, she intended to leave permanently, and she planned to contact a lawyer about a divorce. She stated that the parties' two children were nine and seven years of age.

¶ 8      Petitioner told the court she had obtained an order of protection against respondent years earlier after he became "physical with her," but that the parties subsequently tried to "work it out" for their children. He had not been physically abusive since that incident, but she told the court that he sometimes told her he felt like "beating the crap out of [her]." She stated that earlier in the week, he had taken her keys and would not let her in the house.

¶ 9    Asked whether he abused the children, she said she had a photograph showing that he hit their son "with a belt hard enough that you could see the belt in it." Petitioner stated she was afraid that respondent would "beat me up again."

¶ 10    On June 28, 2023, the court issued an emergency order of protection barring respondent from having any contact with petitioner or their children. Shortly thereafter, respondent appeared and retained counsel.

¶ 11    After a hearing on July 19, 2023, the emergency order of protection was extended, and the court directed the parties to meet with "child relief expediter" to create a parenting time schedule.[1] In August 2023, the parties reached a temporary agreement to a parenting time schedule.

¶ 12    On August 11, 2023, respondent filed a motion to dismiss the petition, arguing its allegations were insufficient. Shortly thereafter, he filed a substantially similar "Motion to Vacate and Motion to Dismiss" the petition.

¶ 13    In late August 2023, respondent served discovery requests on petitioner. Petitioner (through counsel) filed objections to respondent's discovery. Respondent never requested a court ruling as to the validity of the objections, and petitioner never produced any documents before the plenary hearing.

¶ 14    In October 2023, petitioner filed an amended petition supported by her affidavit. The amended petition specified that petitioner had obtained an order of protection against respondent in 2019.

¶ 15    In petitioner's affidavit, she alleged that respondent was physically abusive to her in 2018 and 2019. She also alleged that more recently, he touched her without her permission and told her

---

[1] The Domestic Violence Division of the Circuit Court of Cook County "established the Child Relief Expediter program, which aids the court and the litigatnts who share children to come to a safe agreement regarding access to shared children under the terms of an Order of Protection." https://www.cookcountycourtil.gov/news/circuit-court-cook-county-promotes-justice-families-experiencing-domestic-violence (last visited Dec. 5, 2025).

that it was her "duty" to have sexual relations with him. She separately alleged that in September 2022, respondent hit their son with a belt, leaving marks on his thighs and buttocks, and that he "spanked" both children with a belt on other occasions. In December 2022, after she returned from a Christmas party, he took her keys and refused to let her in the home until her co-worker threatened to call police. Petitioner stated that she feared for her safety and that of her children. The amended petition requested that respondent be denied any parenting time.

¶ 16    On October 4, 2023, respondent filed a motion seeking an order under Supreme Court Rule 215 to compel petitioner to be tested for drugs, claiming she had a history of alcohol and marijuana abuse.  That motion was denied.

¶ 17    On October 5, 2023, the court entered an order suspending respondent's parenting time.

¶ 18    On November 6, 2023, respondent filed an "emergency motion for rehearing" in which he claimed petitioner initiated this case because she was "having an affair with the man she is currently living with, and is using the court because she did this thing." That motion was denied.

¶ 19                          Plenary Hearing

¶ 20    On November 14, 2023, the court heard argument and then denied respondent's motion to dismiss the petition. The court proceeded to conduct a plenary hearing.

¶ 21    Petitioner testified that before June 2023, she, respondent, and their two children resided in the same home.

¶ 22    Petitioner testified that respondent hit her on Christmas Day 2018, after they went to respondent's mother's home for a party. He hit her in the face and body, and stopped when he  saw that she was was bleeding. Petitioner testified that her children "saw part of the hitting and they also saw the blood coming out."

¶ 23    Petitioner identified Exhibit A as a group of photographs that she took of herself after this incident. She testified that they showed where she had been scratched and punched in the face, as well as marks on her neck. In two of the photographs, petitioner is holding a white cloth that appears to be largely covered in blood. The court admitted Exhibit A over respondent's objection on the grounds of lack of "authentication and foundation."

¶ 24    Petitioner also described an incident in February 2019, in which respondent was mad that she could not pick him up from the train station after work when he expected. When he came home, he started hitting her "with a bamboo stick." She testified that the children were present during that incident. Petitioner stated that she took photographs after that incident, but she could not access them because they were on respondent's computer.

¶ 25    Petitioner also testified that in October 2019, she and respondent got into an argument during which he hit, bit, and choked her.

¶ 26    Petitioner stated that June 25, 2023, she told respondent that she no longer wanted "to have any physical contact with him." He responded by telling her that "as his wife it was my duty to be with him even if I didn't want to." That night, she slept in her daughter's bed. She testified that respondent "made the kids feel bad about him sleeping by himself, so both of the kids went to sleep with him because he was feeling lonely."

¶ 27    She recalled that the next day, he "used the kids" to convince her to participate in a "family hug even after I didn't want to." The children told her that "Daddy wanted a hug" and respondent "grabbed both kids and was calling me in and so were the kids." She "hugged the kids, like tried to hug them fast and [respondent] tried to hug me and I just moved away."

¶ 28    On June 27, 2023, respondent followed her into the bathroom when she went to take a shower. Respondent told her "he had his needs" and would not leave. While she was in the shower,

he opened the door and started touching her back. She told him to leave her alone but he continued to touch her. Eventually, he stopped but he continued to watch her shower, which made her very uncomfortable.

¶ 29 Petitioner testified there were times when respondent wanted to have sex and she felt she "couldn't refuse" because if she did "he will accuse me of cheating." Sometimes she would initially refuse but he would persist and she would have sex with him to "just get it over with."

¶ 30 Petitioner also described respondent's use of corporal punishment on their son with a belt. On September 22, 2022, when their son was six years old, she and respondent were called in to school because their son had "showed his private part" to a friend. Their son apologized and said he would not do it again. After they arrived home, respondent took off his belt and took the son to the garage. Petitioner was inside the home with her daughter, but "could hear the belt and [her son] crying and screaming." That evening, he said he could not put on his pajamas because it hurt; she observed belt marks on his legs and buttocks. Petitioner identified Exhibit B as photographs she had taken. Exhibit B was admitted without objection. The two photographs within that exhibit show wide red markings stretching several inches across a child's buttocks and right thigh.

¶ 31 Petitioner testified that there were other instances when respondent hit their son with a belt, and that he sometimes hit her daughter with it. She did not specify how many times this occurred but said he used it "whenever they didn't behave." She also said he would often pinch the children "so they would start listening or behaving," and he sometimes pulled their ears when "they wouldn't listen."

¶ 32 Petitioner recalled that in December 2022, she went to a work Christmas party. Afterward, a co-worker dropped petitioner off at home. Respondent was upset because she had told him she would be home earlier. He asked her to "leave the keys in the mailbox because he wasn't going to

let me in." He eventually let her in after her coworker threatened to call the police. That night, he would not let her sleep in the bedroom.

¶ 33    Petitioner proceeded to identify Exhibit C,  a collection of screen shots showing numerous text message between her and respondent from November 2022 to June 2023. Respondent's counsel objected on the ground of foundation, but the court overruled the objection.

¶ 34    Exhibit C included messages from December 12, 2022, the night of the work Christmas party.  In one of the messages, respondent told her at 12:40 a.m. to leave the keys in the mailbox. The next morning, she texted him at 5:24 a.m. to ask where he had taken the children. According to petitioner, respondent had taken the children to a relative's home and "told her that I was too drunk to take the kids to school." Petitioner denied that she was drunk.

¶ 35    Petitioner testified that other text exchanges demonstrated that respondent required her to tell him her location multiple times a day, including after she brought the children to school and when she arrived at work. She explained that if she did not respond quickly to his inquiries, "He thinks that I am with someone else, that I am cheating, lying, that I have to let him know right away." In one message at 6:51 a.m. on December 14, 2022, he asked (in Spanish) if she was "with my lover or did I arrive home."[2] She denied that she was dating anyone else at that time.

¶ 36    Petitioner also testified that respondent required the bathroom door to be open when she or the children were using it. She also testified that he did not allow her family members in the home.

¶ 37    In the midst of petitioner's testimony, respondent's counsel raised a new objection that the text messages had not been produced in response to his discovery requests. Petitioner's counsel argued that she had objected to the requests, and respondent's counsel never sought a court hearing

---

[2] Some of the text messages were in English and others were in Spanish. There was no interpreter for the text messages.

on any discovery dispute. Petitioner's counsel also stated that respondent's counsel "could have asked for an exhibit exchange date," but never did so.

¶ 38 In overruling respondent's objection, the trial court noted that it had never been presented with any motion regarding a discovery dispute pertaining to document requests. It also noted "the exhibits have already been admitted, some of them over [respondent's] objection."

¶ 39 Petitioner proceeded to testify that she deposited her paychecks into a joint bank account to which respondent had access. Although that account included her income, respondent told her she had to ask his permission to spend those funds.

¶ 40 Petitioner also testified that their daughter has "eating anxiety" and was overweight. Respondent sometimes called their daughter "pig" or other names, which upset her daughter and made her start crying.

¶ 41 Petitioner elsewhere testified that after agreed-upon parenting time visits started in August 2023, respondent used the children to attempt to communicate with her. After the children returned from a visit with respondent, they brought flowers and told her that "daddy sent me flowers because he still loves me and that he wants us to be a family again." At other times, her daughter communicated to petitioner that respondent wanted petitioner to pick the children up after visits. On another occasion, her daughter reported that respondent showed her his bank account and told her he did not have any money.

¶ 42 Petitioner recalled that when she picked up the children from respondent on September 28, 2023, respondent "got mad and just started screaming that I need to stop letting other people manipulate me and telling me what to do." The incident made her uncomfortable and scared. Two days later, DCFS contacted petitioner and told her they received a report that her home was dirty and that she and her boyfriend smoked marijuana in the presence of her son. Petitioner denied that

this was true. She believed the DCFS report resulted from respondent taking their son to the doctor without her knowledge.

¶ 43    Petitioner testified that she was still in fear of respondent, and she wanted him prohibited from contact with her or the children for two years.

¶ 44    On cross-examination, petitioner admitted that she did not go to the hospital or to police after the December 2018 physical altercation. Respondent's counsel suggested there were discrepancies between the photographs and counsel repeatedly asked petitioner if the photographs were "staged," which she denied.

¶ 45    Regarding the incident where respondent struck their son with a belt, petitioner acknowledged she did not actually see how many times he was struck because it occurred in the garage. However, she testified that from within the house she "could hear a belt and the kid screaming." She had not taken the child to the hospital after that incident.

¶ 46    Petitioner acknowledged that for a period of time, she was driving without a license. She admitted she drank socially. She drank at her mother-in-law's party around Christmas 2018, but denied she became intoxicated. She also denied that she was intoxicated when she returned from the work Christmas party in December 2022. She denied any marijuana use.

¶ 47    Elsewhere in cross-examination, petitioner was asked about the June 2023 incident where respondent was angry because she was late from work. Petitioner testified she had worked until about 1 a.m., went to a McDonald's restaurant with a coworker, and got back to her home around 3 a.m. Respondent would not let her in and screamed at her; he asked for her phone but she did not give it to him.

¶ 48    The court briefly questioned petitioner regarding her prior testimony that respondent required the bathroom door to be open when she or the children were in it. The court asked if she

meant it "has to be open or it can be closed but unlocked?" Petitioner answered: "It had to be open."

¶ 49    Petitioner rested after her testimony.

¶ 50    Respondent proceeded to testify. Shortly after his testimony began, he stated that he was employed as a security officer at the University of Illinois Chicago (UIC) Law School. This prompted the court to state as follows:

> "THE COURT: All right, I am going to stop right here. I teach at
>
> the UIC Law School. I have never seen this gentleman and I had
>
> no idea that he worked at UIC.
>
>  [Respondent's counsel]: Okay.
>
> [Respondent]: I am at the front desk.
>
> [Respondent's counsel]: I don't think there is a problem.
>
> THE COURT: So I just want to make sure everybody knows"
>
> [Petitioner's counsel]: Understood."

¶ 51    Respondent proceeded to testify that he had been married to petitioner for 11 years. Asked about Christmas 2018, he recalled the parties and their children spent Christmas Eve at his mother's home, where she hosted a party with numerous other family members.

¶ 52    Respondent recalled that petitioner was drinking at the party, and that around midnight he noticed she was intoxicated. He wanted them to leave the house because her intoxication was "embarrassing" but his mother encouraged them to stay overnight. He had asked petitioner not to "overconsume alcohol" and he was "embarrassed that she still pulled that stunt while I pleaded with her not to." While petitioner was intoxicated, she used "curse words" in front of his mother. They stayed over at his mother's house through most of the next day, Christmas Day.

¶ 53    At that point, respondent's testimony was paused and his mother, Guillermina Velasquez, testified through an interpreter. Velasquez testified she is petitioner's mother-in-law and had seen her at least every year since 2012.

¶ 54    Velasquez recalled hosting a party on Christmas Eve 2018. She recalled that petitioner was "very drunk" and stated that when she drank, she became "stubborn" and "aggressive." On December 26th, 2018, Velasquez saw several family members, including petitioner and respondent. She denied seeing any scratches or other signs of abuse on petitioner's face.

¶ 55    Velasquez testified that the parties sometimes spoke to her about their financial problems, and that had "overspending issues." She recalled that petitioner told her that she had to ask respondent's permission in order to make purchases. Velasquez agreed that respondent "controls the finances."

¶ 56    Asked if she had ever seen respondent administer corporal punishment to the parties' children, Velasquez stated that "he will give them a spanking" if they misbehaved but it was normal and not "abuse." She denied that she ever saw any bruising on the children.

¶ 57    When respondent's direct examination resumed, he identified a December 26, 2018 family photograph, which he testified showed no marks on petitioner's face. Respondent also identified a number of other photographs showing petitioner that were taken in late 2018. He testified that around this time, his wife had long hair and a "plump" face.

¶ 58    Respondent also identified numerous other family photographs showing petitioner through the past several years, as far back as 2012. He testified that in earlier years, she weighed between 115 and 130 pounds. Based on changes in her appearance over time, respondent testified that the photographs in Exhibit A were taken much earlier than December 2018, as petitioner claimed. He

estimated that in the Exhibit A photographs, she weighed between 115 and 130 pounds, whereas in December 2018 she weighed around 160 pounds.

¶ 59    Respondent denied he had any physical altercation with her around Christmas 2018, or that he caused any of the injuries shown in Exhibit A. Instead, respondent believed that Exhibit A was actually from an incident in 2013, when petitioner was intoxicated and "verbally abusive" in the presence of his brother, who was only 14 years old at the time. He recalled that his brother "was trying to be funny" and petitioner "threw a few punches" at his brother. Respondent stated that the injuries in Exhibit A were "self-inflicted" after petitioner locked herself in a bathroom, fell and "hit herself in the sink." He stated that "every time she gets drunk, she is basically *** aggressive, emotional" and "doesn't have any control whatsoever."

¶ 60    Regarding Exhibit B, respondent admitted that he hit the parties' son with a belt, after the school informed them that he had exposed himself to a classmate. Respondent admitted that he was "still somewhat angry" when he did so, but that he hit his son "no more than three" times with the belt. He also testified that his son bruises easily. He admitted he used corporal punishment with his child on other occasions. When asked by his counsel "how many licks" he used, he answered "[n]ot that many" and "Most, two."

¶ 61    Respondent admitted he was controlling "to an extent" about finances, stating that petitioner "can be very liberal with the spending."

¶ 62    Elsewhere, he testified that the children had been tardy to school a number of times, which was why he frequently asked her when the kids arrived. He also testified that he checked in on her at times because she was driving without a license, had three traffic tickets, and because she had issues with being late at work. He also said he was concerned about her because she had driven drunk on multiple occasions, and sometimes she left him "stranded" after she "would get super

drunk and she would not answer my calls." He stated that she "would lie so much, I never exactly knew where she really would be."

¶ 63    Respondent recalled that on June 25, 2023, petitioner did not come home until 4:30 a.m. She claimed she had been with a coworker, but he believed that she had been with another man. After she came home, they had a verbal alteration in which he confronted her about "why she had lied." However, he denied trying to take petitioner's phone.

¶ 64    Respondent also testified that on October 1, 2023, he took his son to the emergency room because his son told him he was feeling dizzy from petitioner and her boyfriend's smoking. Respondent told the doctors he was concerned that his son might be harmed by inhaling cannabis.

¶ 65     Respondent testified that a nurse questioned his son in his presence. According to respondent, his son told the nurse he did not feel safe at home with petitioner, and he described poor living conditions including roaches, "feces and smells and other stuff." Respondent testified that his son had previously told him that the home was dirty.

¶ 66    Respondent admitted he did not allow petitioner's family in the home, because they spoke negatively about him in his presence. He denied that he required petitioner or the children to leave the bathroom door open. Respondent acknowledged the 2019 order of protection, but he denied he harmed petitioner in 2019 or anytime thereafter.

¶ 67    On cross-examination, respondent was shown a portion of the hospital notes from when he brought his son to the emergency room, which stated that his son reported feeling safe at home. Respondent claimed that this portion of the hospital's notes was "incorrect."

¶ 68                                    Trial Court Findings

¶ 69    In its oral findings, the court found the "easiest part" of the ruling was that the son was subjected to physical abuse within the meaning of the Domestic Violence Act when respondent

struck him with a belt. The court recognized that "reasonable" discipline is permitted but found "this was not reasonable."

¶ 70    The court also found that petitioner was a victim of physical abuse. It discussed Exhibit A as showing "marks that are consistent with being struck, scratched" as well as "visible marks on the neck." The court acknowledged respondent's contention that the photographs in Exhibit A could not have been from December 2018, because her appearance was very different from other photographs of her from that period. However, the court did not find that her appearance was so different to undermine Exhibit A: "[I]t does not appear to be completely out of sync or out of whack with the other photographs of her from around that era."

¶ 71    After noting the conflicting testimony, the court found it "more likely than not" that respondent inflicted the injuries in Exhibit A. It also credited petitioner's testimony about other acts of physical abuse. The court also found that the testimony and text messages suggested this was a "textbook case of coercion and control" where petitioner frequently had to let respondent know her location. The court credited the testimony that in December 2022, respondent reacted to petitioner staying out late by taking her keys and denying her access to the home. The court also found respondent was "absolutely in financial control." The court also credited petitioner's testimony that respondent required the bathroom door to remain open while she or the children used it.

¶ 72    The court found that the children should be protected parties, noting the physical abuse of the son and crediting the testimony that respondent "demeans the daughter because she is overweight and calls her names."

¶ 73    In conjunction with its oral findings, the court issued a plenary order of protection reflecting that respondent committed "physical abuse", "harassment," "interference with personal

liberty," and "intimidation of a dependent" within the meaning of the Act. The order of protection barred respondent from any contact with petitioner or the children for a period of two years.

¶ 74   In January 2024, respondent filed a "motion to vacate" and a "motion for reconsideration" attacking the plenary order. On March 1, 2024 the court heard argument and denied respondent's motions. On March 28, 2024, respondent filed a notice of appeal.

¶ 75                                    ANALYSIS

¶ 76   On appeal, respondent primarily challenges the court's findings that he committed abuse of petitioner and the children within the meaning of the Act, contending such findings were against the manifest weight of the evidence. He separately contends that the remedy imposed by the court—barring all contact with petitioner and the children for two years—was an abuse of discretion and contrary to the children's best interests.

¶ 77   Elsewhere, respondent claims that the trial court erred by failing to recuse itself "or at least suspend trial" after respondent revealed that he worked at the UIC Law School. Finally, he claims the trial court committed reversible error in admitting evidence that was not produced in discovery, which prejudiced him by allowing petitioner to "ambush" him at trial.

¶ 78   For the following reasons, we reject respondent's arguments and affirm.

¶ 79                        Challenges to the Trial Court's Findings

¶ 80   We will first address respondent's challenges to the trial court's findings of abuse within the meaning of the Domestic Violence Act of 1986 (Act). 750 ILCS 60/101 *et seq.* (West 2024).

¶ 81   "The Act provides for three types of orders of protection: emergency (750 ILCS 60/217 (West 2020), interim (750 ILCS 60/218 (West 2020), and plenary (750 ILCS 60/219 (West 2020)." *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 40. This is an appeal from entry of a plenary order of protection.

¶ 82    Section 214 of the Act provides: "If the court finds that petitioner has been abused by a family or household member **** an order of protection prohibiting the abuse, neglect or exploitation shall issue." 750 ILCS 60/214 (West 2022). "A plenary order of protection *** 'shall be valid for a fixed period of time, not to exceed two years.' " *Graham*, 2024 IL App (2d) 230611, ¶ 41 (quoting 750 ILCS 60/220(b)(0.05) (West 2020)).

¶ 83    "In any proceeding to obtain an order of protection, the central inquiry is whether the petitioner has been abused." *Best v. Best*, 223 Ill. 2d 342, 348. (2006). Under the Act, the term "abuse" means "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent." 750 ILCS 60/103(1) (West 2022). Harassment is defined to mean "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2022).

¶ 84    Whether the petitioner has been abused is an issue of fact that must be proven by a preponderance of the evidence. *Best*, 223 Ill. 2d at 348. Accordingly, a finding of abuse "will be reversed only if it is against the manifest weight of the evidence." *Id*. at 349.

¶ 85    "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id*. at 350. Under this standard, we "give deference to the trial court as the finder of fact because it is in in the best position to observe the conduct and demeanor of the parties and witnesses." *Id*. A reviewing court "will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id*.

¶ 86    With this standard in mind, we address respondent's challenges to the trial court's findings.

¶ 87                    Findings of Physical Abuse of Petitioner

¶ 88    Respondent primarily takes issue with the finding that he physically abused petitioner in December 2018, claiming the trial court "improperly weighed the evidence." He suggests the court erred in crediting petitioner's testimony (including that Exhibit A showed injuries from that incident) while disregarding conflicting testimony and photographs. He urges that he provided a photograph from December 26, 2018 that showed she had no injuries, and that he submitted numerous other photographs that showed that Exhibit A could not have been from 2018. He maintains the injuries depicted in Exhibit A were from several years earlier, when "she fell into a vanity because was intoxicated." He alleges that the court "entirely ignored this evidence."

¶ 89    Keeping in mind that it is not the role of this court to re-weigh the evidence, we cannot say the trial court's findings as to the December 2018 incident were against the manifest weight of the evidence. Contrary to respondent's suggestion that the trial court "ignored" the evidence, the record shows that it considered the testimony and the various photographs submitted by the parties, and decided that petitioner's evidence was more credible. Obviously, it was the court's role to decide the apparent conflict between petitioner's testimony that respondent injured her, compared to respondent and his mother's contrary testimony.

¶ 90    Further, the transcript belies respondent's claim that the trial court simply ignored the photographs offered by respondent in support of his claim that Exhibit A could not have been from 2018. The transcript reflects that the court reviewed the photographs relied on by respondent, but did not find that any purported difference in petitioner's appearance was so significant to cause it to doubt petitioner's testimony that Exhibit A showed her injuries after the December 2018 incident.

¶ 91    While respondent urges that the injuries in Exhibit A are "much more consistent with falling into a vanity than being punched," this is another improper request for this court to re-weigh the evidence and second-guess the trial court's credibility determinations. In any case, we think the trial court was reasonable in finding that the injuries shown (particularly marks on petitioner's neck) were consistent with the incident she described. After reviewing the testimony and exhibits pertaining to the alleged December 2018 incident, we cannot say the opposite conclusion was evident or that the court's decision to credit petitioner's account was unreasonable.

¶ 92    Moreover, we point out that petitioner testified to separate incidents of physical abuse by respondent against her that occurred in 2019.  Respondent's brief emphasizes that petitioner did not offer photographs, police reports, or other "independent corroboration" of those alleged incidents. He also suggests that her allegations of past abuse "lack detail when compared to other order of protection cases which should have called [her] credibility into question."

¶ 93    Such arguments are unavailing. There is simply no requirement that a victim of abuse must present independent corroboration, such as a photograph or police report, for a fact finder to credit her testimony. The lack of such corroboration does not render a credibility determination against the manifest weight of the evidence. Similarly, it was for the factfinder (not this court) to assess whether the purported lack of detail in petitioner's testimony impacted her credibility.

¶ 94    We likewise reject respondent's suggestions that the court should have given petitioner's testimony less credibility because she was "cagey and evasive" when asked about her drinking habits, or his claim that she was cheating on respondent and instigated this case to keep the children away from him. These are simply improper invitations to second-guess the trial court's credibility determinations. Moreover, we note that, even assuming petitioner had any issues with alcohol or

became romantically involved with someone else, this would not necessarily mean she was being untruthful when she described her abuse by respondent.

¶ 95    In short, we reject respondent's suggestion that findings of physical abuse against petitioner were against the manifest weight of the evidence.

¶ 96    For the same reasons, we uphold the trial court's finding that respondent committed intimidation of a dependent. Under the Act, intimidation of a dependent means "subjecting a person who is dependent because of age, health or disability to participation in or the witnessing of: physical force against another *** which constitutes physical abuse as defined in this Act." 750 ILCS 60/103(10) (West 2022). Here, petitioner testified that respondent struck her in front of the children on multiple occasions. The trial court was certainly entitled to credit that testimony.

¶ 97    Evidence Supported the Findings of Harassment and Interference with Personal Liberty

¶ 98    We note that, based on the findings of physical abuse, the trial court did not need to make additional findings of harassment in order to impose an order of protection. See 750 ILCS 60/214(a) (an order of protection shall issue if the court finds that petitioner has been abused by a family or household member). In any event, we also reject respondent's claim that the trial court erred in finding that he engaged in "harassment" of petitioner within the meaning of the Act. See 750 ILCS 60/103(7) (West 2022) (harassment is "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner.") The same evidence also supported the court's finding of interference with personal liberty within the meaning of the Act. See *id.* §103(9) (" 'Interference with personal liberty' means committing or threatening physical abuse, harassment, intimidation or willful deprivation so as to compel another to engage in conduct

from which she or he has a right to abstain or to refrain from conduct in which she or he has a right to engage.").

¶ 99   In challenging these findings, respondent again urges that petitioner's testimony was "not credible" because it lacked corroboration or sufficient detail. Emphasizing that harassment is "conduct that is not necessary to accomplish a purpose that is reasonable under the circumstances," *id*., he also claims the court should have credited his testimony that he had valid reasons for frequently checking on her. For example, he suggests he simply "wanted to know when [she] arrived places because she was driving without a license and had a tendency to drive recklessly," he monitored her spending out of concern for their budget, and that he was "rightfully suspicious" that she was seeing another man. Again, it was the role of the trial court to assess the evidence, including the credibility of petitioner's testimony about the nature of respondent's conduct, as well as respondent's testimony as to the reasons for his conduct. The trial court was entitled to believe petitioner and not respondent.

¶ 100   We also reject respondent's suggestion that the court could not find harassment within the meaning of the Act, because she did not adequately detail how he would respond if she did not comply with his demands. He argues she failed to describe "specific instances where [respondent] got angry" or "severe harassing, threatening or intimidating consequences to breaking these alleged rules." Although we recognize that harassment must cause "emotional distress" to the petitioner, 750 ILCS 60/103(7) (West 2022), respondent cites no authority suggesting that a petitioner must show that she was subject to yelling, name-calling, or angry outbursts. Here, petitioner testified that respondent engaged in a pattern of conduct (much of which respondent admitted to) that made her afraid and uncomfortable. The court was entitled to believe her. Thus,

we cannot say the court's findings of harassment or interference with personal liberty were against the manifest weight of the evidence.

¶ 101                    The Court Did Not Err in Finding Child Abuse

¶ 102   We also reject respondent's claim that the court's finding that he abused the children was against the manifest weight of the evidence. Respondent points out that corporal punishment is not prohibited, and that the Act specifically excludes "reasonable direction of a child by a parent" from the definition of "abuse." See 750 ILCS 60/103(1) (West 2022) (abuse "does not include reasonable direction of a minor child by a parent.") He proceeds to suggest that he acted reasonably in disciplining his son with a belt, and that his conduct was not nearly as serious or violent as that in other order of protection cases concerning child abuse. He posits that his conduct was permissible because he "was calmed down when he hit the child with the belt," he hit his son "no more than three times," and because it was in response to his son exposing himself at school, which "warrants punishment."

¶ 103   These arguments are unavailing. Given the deference owed to the trial court on fact questions and credibility, the court was certainly entitled to find that respondent's hitting his son with a belt (which he admitted was reflected in Exhibit B) was unreasonable and met the definition of abuse.  As the trial court noted, respondent testified that he struck his son with a belt in anger. Despite respondent's testimony that he only hit him a few times and that his son bruised easily (which the court was entitled to find unbelievable), the photographs showed significant markings on the child's buttocks and thigh. The court could find the photographs supported petitioner's testimony that the child was in such pain that he could not put on his pajamas. Certainly, the court could find this incident went beyond a reasonable exercise of parental discipline.

¶ 104    We also note that, while this was the only incident for which photographs were introduced, petitioner testified that respondent hit the children with a belt on other occasions. The trial court was entitled to believe that testimony, which was not contradicted. Indeed, respondent explicitly acknowledged that he used the belt to hit his son on other occasions.

¶ 105    For the same reasons, we reject respondent's related argument that the trial court violated his "constitutional rights as a parent to punish his child" when it determined that his use of corporal punishment was abuse. It is true that "a parent has the 'right' to corporally discipline his or her child, a right derived from our constitutional right to privacy." *In re J.P.*, 294 Ill. App. 3d 991, 1002 (1998) (citing *In re F.W.*, 261 Ill. App. 3d at 898 (1994)). "But this right, like any other, must be exercised in a 'reasonable' manner." *Id.*; see also *In re K.C.*, 2024 IL 240430, ¶ 64. That is, there is no constitutional violation in the prohibition of excessive or unreasonable corporal punishment. As discussed, the trial court found that respondent's use of corporal punishment was unreasonable. That finding was not against the manifest weight of the evidence.

¶ 106                    The Order of Protection Was Not an Abuse of Discretion

¶ 107    We turn to respondent's attack on the terms of the plenary order of protection. He does not challenge the decision to bar him from contacting petitioner. However, he argues that the court abused its decision in barring him from any parenting time or other contact with the children for two years.

¶ 108    In reviewing this claim, we are mindful that "[t]he Act is to be construed liberally to promote its purposes, which include supporting the victims of domestic violence to avoid further abuse and 'reduce the abuser's access to the victims *** so that victims are not trapped in abusive situations.' " *In re Marriage of Young*, 2013 IL App (2d) 121196, ¶ 20 (quoting 750 ILCS 60/102(4) (West 2010)).

¶ 109    Under section 214(a) of the Act, once the court has found abuse, an order of protection "shall issue." 750 ILCS 60/214(a) (West 2022).   "Section 214(b) provides for no less than 19 possible remedies available to the trial court 'in addition to other civil or criminal remedies available to petitioner.' " *Sanchez v. Torres*, 2016 IL App (1st) 151189, ¶ 22 (quoting 750 ILCS 60/214(b) (West 2012)). Thus, the trial court may "tailor an order of protection to address individual circumstances and needs, improve victim safety and hold the perpetrator accountable for his or her actions." *Id*.

¶ 110    We review the issuance of a plenary order of protection for an abuse of discretion. *Lynn v. Brown*, 2017 IL App (3d) 160070, ¶ 8 (citing *Lutz v. Lutz*, 313 Ill. App. 3d 286, 289 (2000)). A trial court abuses its discretion only where no reasonable person would take the view adopted by the court. *Id*.; see also *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009) (abuse of discretion occurs when trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.")

¶ 111    In arguing error, respondent urges that "the best interests of the children are served by having a relationship with both parties" and that it was far too severe for the court to bar him from any contact with his children, even supervised parenting time, for two years. This is especially true, he says, because there was no showing that the children were fearful of him or "traumatized by his behavior." He maintains his actions were not "clearly abusive as they were done for disciplinary purposes" and not to inflict emotional distress. In urging that we find an abuse of discretion, he says the court essentially determined that the children's relationship with him was "unimportant and that they were better off without a father" for two years.

¶ 112    Respondent also relies on the proposition that an order of protection is not a proper means to resolve child custody or visitation issues. See *In re Marriage of Potenza and Wereko*, 2020 IL

App (1st) 192454, ¶ 56 (child custody or visitation issues "should be resolved under the Illinois Marriage and Dissolution of Marriage Act." (quoting *Radke ex rel Radke v. Radke* , 349 Ill. App. 3d 264, 268-69 (2004)). He suggests the trial court failed to recognize that petitioner's "true purpose" in seeking an order of protection was an improper attempt to "circumvent custody proceedings" and keep him from the children. As support, he asserts she lied to the court at the June 2023 emergency hearing when she stated she would seek a divorce, since she has not filed for divorce. Thus, he claims she "clearly utilized the Domestic Violence Act as a means for circumventing the IMDMA."

¶ 113   To be sure, the terms of the order of protection were strict, insofar as they barred him from contact with the children for two years. However, we keep in mind that we will not find an abuse of discretion unless a trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Blum*, 235 Ill. 2d at 36.

¶ 114   Although this court would not necessarily impose the same restrictions, we cannot say that no reasonable person would agree with the trial court's decision. We keep in mind that the trial court heard extensive testimony about the ways in which respondent physically abused petitioner and the children, and otherwise harassed and controlled petitioner.  And apart from physical abuse, the court also heard testimony about other forms of conduct that affected the children, such as: forcing them to keep the door open when they used the  bathroom; insulting their daughter about her weight; and using the children to communicate with petitioner when he was already barred from doing so. The court heard other instances that could be construed as manipulating the children to harass petitioner, such as by asking for a "family hug", telling the children that he felt bad sleeping by himself, and telling the son's doctor that petitioner exposed him to marijuana.

¶ 115   Section 214 of the Act expressly permits restriction or denial of parenting time if a respondent is "likely to abuse or endanger" a minor, use parenting time "as an opportunity to abuse or harass petitioner", or "otherwise act in a manner not in the best interests" of the child.  750 ILCS 60/214(7) (West 2024).  There was sufficient evidence for the trial court to find that respondent would not act in the children's best interests if he was allowed further contact with them. We cannot say its decision to bar contact was wholly unreasonable.

¶ 116   Further, we decline respondent's suggestion that we should assume that petitioner improperly used these proceedings as a means to decide custody and parenting time issues. While we acknowledge that order of protection proceedings under the Act are not intended to decide such issues, we must reject as speculative respondent's argument that petitioner acted in bad faith in the underlying proceedings. We again note that petitioner testified extensively on direct and cross-examination, and the trial court found her allegations of abuse to be genuine and credible. There is no basis for this court to ignore those findings and instead find that petitioner was actually deceiving the court about her true motive for instituting the proceedings.

¶ 117   Moreover, we point out that relatively early in this case, in July 2023, the trial court appropriately referred the parties to a child relief expediter, who helped arrange an agreed-upon parenting time schedule. This practice should be encouraged in order of protection proceedings under the Act to protect the interests of the parties' children where, as here, the parties are married but do not have a pending divorce case in the Domestic Relations Division. We note that the record in this case reflects that the agreed-upon parenting time schedule was ended by the court in early October 2023, after respondent used his parenting time to harass and manipulate petitioner and the children.

¶ 118   In short, while we acknowledge the result of the plenary order was harsh, we cannot say that the court abused its discretion, in light of the ample evidence that respondent's conduct threatened the children physically and emotionally.

¶ 119              Respondent's "Conflict of Interest" Claim Is Without Merit

¶ 120   Wholly separate from the substance of the trial court's findings and order, respondent argues the trial court committed reversible error after a "conflict of interest" was revealed. He claims that, after he revealed he was employed by the UIC Law School (where the trial judge taught), the trial judge was required to recuse herself, or "at least suspend trial and enable [respondent] to make an informed decision on moving forward." He acknowledges the trial judge immediately disclosed that she taught at the law school, and asked the parties if they had any issue with proceeding. Yet, he now claims the trial court erred in that it failed to afford him a further "opportunity to consider" how to proceed. He suggests that the judge's conduct violated Rule 2.11 within Canon 2 of the Illinois Code of Judicial Conduct. Illinois Code of Judicial Conduct, Canon 2, Rule 2.11 (eff. Jan. 1, 2023). [3]

¶ 121   At the outset, we note this claim is forfeited. Respondent's counsel did not raise any concern after the trial judge disclosed that she taught at UIC Law School; to the contrary, respondent's counsel stated "I don't think there is a problem." Further, respondent counsel never filed a motion for substitution of judge.

¶ 122   We recognize that respondent's post-hearing motion for reconsideration urged that the trial judge should have recused herself to "avoid the appearance of impropriety." In denying that motion, the judge found this argument was "waived", explaining that "nobody questioned my

---

[3] Respondent's brief erroneously refers to "Illinois Supreme Cout Rule 2.11" but context makes clear that he actually intends to rely on the Code of Judicial Conduct.

impartiality when I disclosed immediately that apparently I occasionally worked in the same building" as respondent.

¶ 123   We agree with the trial court that forfeiture should apply. Respondent's counsel plainly could have, but chose not to, raise any concern after the trial court disclosed the information that respondent now claims posed a "conflict of interest." Moreover, this court has recently noted (albeit in a Rule 23 order) that "there is precedent for finding the failure to move for substitution of judge forfeits a claim of judicial bias." *In re Marriage of Lebovich*, 2025 IL App (1st) 230576-U, ¶ 45 (citing *County of Peoria v. Couture*, 2022 IL App (3d) 210091, ¶ 49). Such forfeiture is consistent with our precedent's recognition that "a party who wishes to compel a judge's removal from a civil case must use section 2-1001 of the Code." *In re Marriage of Peradotti*, 2018 IL App (2d) 180247, ¶ 32 (citing *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 46). In Illinois, substitution of a judge in civil cases is solely governed by section 2-1001 of the Code of Civil Procedure. *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 26; 735 ILCS 5/2-100 (West 2022). Respondent never sought substitution of judge under section 2-1001.

¶ 124   In any event, even assuming the issue was not forfeited, there is no merit to respondent's claim that the trial court violated any ethical rule. "Whether a judge should recuse himself is a decision in Illinois that rests e*xclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code." (Emphasis in original). *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. Canon 2.11 of the Code of Judicial Conduct states that a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including, but not limited to" various specified circumstances. Illinois Code of Judicial Conduct, Canon 2, Rule 2.11(A) (eff. Jan. 1, 2023). Such circumstances include where the judge "has a personal bias or prejudice concerning a party or a party's lawyer or personal

knowledge of facts that are in dispute in the proceeding"; where a person related to the judge is a party, lawyer, or witness involved in the proceeding; or where the judge or a family member has an economic interest in the case. *Id.*

¶ 125 Here, there is no basis on which to find that the trial judge was subject to disqualification. The transcript indicates that, at most, respondent worked as a security officer at the UIC Law School; the judge taught at the law school but had never met respondent. We note that "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *Eychaner v. Gross,* 202 Ill. 2d 228, 280 (2002). There is nothing in this record to suggest any bias or partiality on the part of the trial judge.

¶ 126 Moreover, there is no support for respondent's suggestion that the trial court was required to suspend trial to allow him time to consider whether to oppose the trial judge remaining on the case. We recognize that Rule 2.11(c) states that "a judge subject to disqualification *** may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, outside the presence of the judge and court personnel, whether to waive disqualification." Illinois Code of Judicial Conduct, Canon 2, Rule 2.11(C) (eff. Jan. 1, 2023). Yet this rule provides no support for respondent, since there was no factual basis making the trial judge "subject to disqualification." In short, respondent does not identify any factual basis or legal authority suggesting that the trial judge was compelled to either recuse herself or suspend proceedings.

¶ 127        Admission of Plaintiff's Previously Undisclosed Exhibits Was Not Error

¶ 128 Lastly, we address respondent's claim that the trial court committed error in admitting petitioner's exhibits because these materials were not produced in discovery or otherwise provided to his counsel in advance of the plenary hearing. He notes that he served discovery requests in

August 2023, but petitioner responded with "blanket object[ions] to all discovery requests" and produced no documents. According to respondent, this "indicate[d] she doesn't plan on introducing any evidence." Respondent urges that the court subsequently permitted petitioner to conduct "trial by ambush" when it admitted her exhibits. He contends that he was prejudiced, resulting in reversible error.

¶ 129    In response, petitioner notes that respondent's discovery requests are not in the record on appeal; it is well-settled that doubts arising from the incompleteness of the record will be resolved against the appellant. See *Foutch v. O'Bryant*, 99 Ill.2d 389, 392 (1984). Petitioner otherwise points out that it was not until the midst of testimony about Exhibit C that respondent's counsel raised an argument that the exhibits should have been produced before the hearing. Thus, she argues that respondent waived this objection to their admission.

¶ 130    Petitioner otherwise argues that, although her exhibits were not previously disclosed, their admission was not error because respondent "was not diligent" in discovery. She points out that (1) respondent never filed a motion asking the trial court to rule on petitioner's objections to his discovery requests and (2) he never requested an order requiring disclosure exhibits before the hearing.

¶ 131    Generally, admission of evidence is within the sound discretion of the trial court and we will not reverse the court unless that discretion was clearly abused. *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28. Under these circumstances, we find no abuse of discretion in admitting petitioner's exhibits, notwithstanding that they had not been disclosed before the plenary hearing.

¶ 132    Petitioner's arguments are well-taken. First, review of the record shows that respondent failed to make a timely objection that petitioner's exhibits had not been previously disclosed. To

challenge the admission of evidence, Illinois Rule of Evidence 103 requires a "timely objection" stating the "specific ground of objection, if the specific ground [is] not apparent from the context." Ill. R. Evid. 103(a)(1) (eff. Oct. 15, 2015). Further, "[A] contemporaneous trial objection *** must be made to preserve a claim of error for appeal." Ill. R. Evid 103(b)(1); see also *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 95 (a party is required to "object contemporaneously when objectionable evidence is offered at trial," to avoid waiver). "Failure to timely object and raise the issue in a posttrial motion results in forfeiture of the issue on appeal." *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶17 (defendant's failure to object at trial to admission of X-rays waived the issue, despite motion *in limine* regarding that evidence.)

¶ 133   The transcript shows that respondent's counsel did not raise this issue with the court until after the photographs in Exhibits A and B had already been admitted and discussed in petitioner's testimony. As for the text messages in Exhibit C, respondent initially only objected to them on the basis of lack of foundation; after that objection was overruled, petitioner began testifying about the messages. Only in the midst of that testimony (approximately 10 pages of transcript later) did respondent raise a new objection that the exhibits should have been produced in discovery.  We agree with petitioner that this objection was not timely raised, which resulted in forfeiture.

¶ 134   Moreover, even if we found no waiver or forfeiture, we would decline to find any error in admission of petitioner's exhibits for a different reason. Specifically, any surprise to respondent from the exhibits was a result of respondent's counsel's failure to seek court intervention *before the hearing* to either rule on petitioner's objections to discovery or to otherwise identify trial exhibits. Had his counsel been diligent in doing so, respondent would not have suffered the "trial by ambush" he complains of.  In light of this, we cannot say the trial court abused its discretion in admitting petitioner's exhibits.

¶ 135   Illinois Supreme Court Rule 214 governs requests for documents, including objections thereto.  Rule 214(c) states: "Any objection to the request or the refusal to respond *shall be heard by the court upon prompt notice and motion of the party submitting the request*.") (Emphasis added). Ill. S. Ct. R. 214(c) (eff. July 1, 2018). Thus, in response to an objection, it is the burden of party seeking the documents to file a motion seeking a court ruling. Having failed to do so, respondent could not belatedly complain about petitioner's failure to produce the documents she introduced at trial.

¶ 136   We agree with petitioner that this situation is akin to that in *Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068 (1994). There, defendant objected to a portion of plaintiff's Rule 214 request seeking production of certain "work progress report and job logs." *Id*. at 1080. However, plaintiff never made a motion asking the court to resolve the dispute. Subsequently, at trial, the court admitted documents introduced by defendant that (according to plaintiff) should have been disclosed earlier in response to plaintiff's discovery requests.  *Id*. at 1081.

¶ 137   On appeal, the *Gausselin* court rejected plaintiff's claim that the trial court erred in admitting the documents, citing plaintiff's "own failure to adhere to the applicable rules of discovery." *Id*. at 1082.  The court pointed out that under Rule 214, any objection to a discovery request shall be heard by the court upon "motion *of the party submitting the request*" but that plaintiff failed to file such a motion. (Emphasis in original.) *Id*. (quoting Ill. S. Ct. R. 214). The court commented that it found "no case law *** which would permit a court to sanction a party for failing to respond to a discovery request filed by the opposing party, *after objecting to that particular request and receiving no response to that objection*." (Emphasis added.) *Id*. The court remarked that "the surprise plaintiff claims he experienced when he learned of the documents at

trial was a result \*\*\* of his failure to discover before trial what documents defendant had in its possession of control." *Id*. at 1083.

¶ 138   We find *Gausselin* is on point. After petitioner objected to respondent's document requests, it was up to respondent to file a motion seeking a ruling on the matter. Respondent never did so. We also note that respondent apparently never asked the court to order any pre-hearing exchange of exhibits. In short, the lack of diligence by respondent's counsel is the underlying reason for the claimed "trial by ambush." Under these circumstances, we cannot say the trial court abused its discretion in admitting petitioner's exhibits.

¶ 139                                                  CONCLUSION

¶ 140   For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 141   Affirmed.